# Illinois Official Reports

## Appellate Court

---

**Edward Atkins, M.D., S.C. v. Robbins, Salomon & Patt, Ltd.,**
**2018 IL App (1st) 161961**

---

| | |
|---|---|
| Appellate Court Caption | EDWARD ATKINS, M.D., S.C., Plaintiff-Appellant, v. ROBBINS, SALOMON & PATT, LTD., and ALAN WOLF, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket No. 1-16-1961 |
| Filed | February 22, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-6477; the Hon. Brigid Mary McGrath, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | David A. Novoselsky, of Novoselsky Law Offices, P.C., of Waukegan, for appellant.<br><br>Karen Kies DeGrand, Donald J. Brown Jr., and Bradley E. Puklin, of Donohue Brown Mathewson & Smyth LLC, and Richard Lee Stavins of Robbins, Salomon & Patt, Ltd., both of Chicago, for appellees. |
| Panel | PRESIDING JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Justices McBride and Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, Edward Atkins, M.D., S.C. (Corporation), filed a legal malpractice lawsuit against defendants, attorney Alan Wolf (Wolf) and his law firm Robbins, Salomon & Patt, Ltd. (Robbins) (collectively, defendants), for allegedly failing to include postemployment restrictive covenants in two employment contracts. As a result of these alleged omissions, two of the Corporation's former employees formed a company that contracted with River North Same Day Surgery, LLC, to provide anesthesia services that previously had been provided by the Corporation. The case eventually proceeded to a bench trial. Following the Corporation's case-in-chief, the Cook County circuit court granted defendants' motion for a directed finding on the issue of damages, ruling as a matter of law that an unprofitable business could not obtain damages for lost profits despite its sole shareholder being highly compensated as an employee, and accordingly entered judgment in favor of defendants.

¶ 2    The Corporation now appeals the judgment of the circuit court, contending primarily that the court erred in granting the motion for a directed finding due to its misapplication of Illinois law and federal tax laws. Because we find the court's ruling portrays an improper interpretation of the actual finances of professional corporations and would in all likelihood prevent such corporations from ever proving lost profits, we reverse and remand.

¶ 3                                I. BACKGROUND
¶ 4                                  A. Pretrial
¶ 5    Dr. Edward Atkins, a licensed physician anesthesiologist, was the sole shareholder and officer of the Corporation. The Corporation was formed in 1984 as a business through which Dr. Atkins would provide anesthesia services to medical centers. In 1987, Dr. Atkins along with other business associates bought an outpatient surgical center called North Shore Same Day Surgery. The Corporation provided anesthesia services to the center. In the early 1990s, the Corporation hired its first anesthesiologist outside of Dr. Atkins. By 2003, Dr. Atkins owned an interest in several outpatient surgical centers, including the surgical center at issue in this appeal, River North Same Day Surgery, LLC (River North center). The Corporation had contracts with these surgical centers to be the exclusive provider of anesthesia services, which, in part, required it to staff the centers with anesthesiologists and nurse anesthetists. Dr. Robert Gay, an anesthesiologist, was one such person, and he signed an employment contract with the Corporation in 2003. That contract did not contain a postemployment restrictive covenant.

¶ 6    In 2004, Dr. Atkins and his business associates sold their interests in five surgical centers, including the River North center, to United Surgical Partners International (USPI). Following the sale, the Corporation negotiated contracts with USPI to continue providing exclusive anesthesia services to the five surgical centers. In particular, the contract between the River North center and the Corporation was for 3 years, beginning on October 15, 2004, but would automatically renew for an additional 3-year term unless either party gave 120 days' written notice before the current term expired. The River North center could also terminate the contract without cause provided that it gave six months' notice and had the approval of its corporate partner and the physicians who owned at least two-thirds of its outstanding equity interests.

¶ 7        In March 2005, Dr. Radha Sukhani, an anesthesiologist, signed an employment contract with the Corporation. That contract did not contain a postemployment restrictive covenant.

¶ 8        From the late 1980s through 2008, Dr. Atkins utilized Robbins, in particular Wolf, to perform various transactional work for the Corporation.

¶ 9        At some point in 2007, Dr. Atkins learned that USPI had changed its policy regarding the length of the anesthesia services contracts. Instead of using three-year terms, USPI decided to use one-year terms. In May 2007, USPI informed Dr. Atkins that it was terminating the River North center contract, as well as the other contracts with the Corporation, apparently based on the six months' notice provision. Concerning the River North center, USPI informed Dr. Atkins that it would solicit requests from other companies to provide anesthesia services but invited the Corporation to submit a bid for the new one-year contract, which the Corporation ultimately did. Dr. Atkins knew at least two other groups had submitted bids, including one from Evanston Hospital and one that had been formed by Dr. Gay and Dr. Sukhani, who both had regularly worked at the River North center.

¶ 10       In June 2007, USPI awarded the new contract with the River North center to Dr. Gay and Dr. Sukhani's company. USPI, however, renewed the remaining contracts with the Corporation at its other surgical centers on one-year terms. After losing the River North center contract, Dr. Atkins reviewed his employment contracts with Dr. Gay and Dr. Sukhani and observed that neither had a postemployment restrictive covenant. Initially, the Corporation filed a lawsuit against Dr. Gay and Dr. Sukhani for tortious interference with prospective economic advantage. Robbins began as the Corporation's attorneys in that case.

¶ 11       However, in April 2009, the Corporation sued Robbins and Wolf for legal malpractice for failing to include postemployment restrictive covenants in Dr. Gay and Dr. Sukhani's contracts. The Corporation voluntarily dismissed the case and refiled it in June 2012.

¶ 12       In the Corporation's first amended complaint, which frames this appeal, it claimed that Wolf had drafted several employment contracts between the Corporation and its employed anesthesiologists. The Corporation alleged that Wolf knew it was "imperative that each agreement contain a restrictive covenant provision that would preclude the anesthesiologist from rendering medical services as an anesthesiologist for a period of two (2) years after the termination of his or her employment." The Corporation asserted that Wolf had included these restrictive covenants in prior employment contracts he had drafted on its behalf and attached an example of one to the complaint. The Corporation highlighted that the employment contracts for Dr. Gay and Dr. Sukhani did not contain postemployment restrictive covenants and posited that Wolf had drafted the contracts. The Corporation alleged that Wolf had acted negligently by failing to include the provisions, which, in turn, caused it to lose the new contract with the River North center to Dr. Gay and Dr. Sukhani. As a result, the Corporation claimed that it suffered damages in excess of $50,000, constituting the lost profits it would have earned had the contract with the River North center been retained beyond 2007.

¶ 13       Over the course of the next three years, the parties conducted discovery and filed various motions. During discovery, pursuant to Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007), the Corporation disclosed Dr. Stan Smith, who had a Ph.D. in economics, as a controlled expert witness. Dr. Smith authored a report in 2012, which estimated the loss of income to Dr. Atkins personally as a result of the non-renewal of the contract between the Corporation and the River North center. Dr. Smith estimated that, if Dr. Atkins worked full-time until age 67, he would have lost approximately $27 million in income.

¶ 14 In September 2015, as the case proceeded toward trial, defendants filed several motions *in limine* related to the Corporation's theories on causation and damages. In defendants' seventh motion *in limine*, they argued that the Corporation should be barred from recovering any alleged future lost profits because it could not calculate these damages with reasonable certainty. In support, defendants argued that the Corporation's proffered evidence for trial would be "based on imprecise and unreliable data," therefore "amount[ing] to speculation." They also argued that the Corporation's documented financial history was "inconsistent" with a claim for lost profits given that its tax returns from 2003 to 2007 showed it did not yield any corporate profit. The circuit court denied the motion, finding that defendants' argument went to the "weight" of the Corporation's evidence to be presented at trial.

¶ 15 In defendants' eighth motion *in limine*, they argued that the Corporation should be barred from presenting the opinion testimony of Dr. Smith because his testimony would be based on improper assumptions and unsubstantiated conjecture. The circuit court denied the motion but noted that "some of his testimony will be impacted by [its] other rulings."

¶ 16 In defendants' ninth motion *in limine*, they argued that the Corporation should not be allowed to "mak[e] any reference to or elicit[ ] any testimony regarding" Dr. Atkins's "individual compensation as evidence" of the Corporation's "alleged lost profits." Defendants claimed that Dr. Atkins structured his business in the corporate form and compensated himself in a manner to reap certain corporate tax advantages. They therefore contended that the Corporation could not ignore its corporate structure to allege lost profits based on the compensation of Dr. Atkins and instead had to base such alleged lost profits on the Corporation's year-end income. The circuit court granted the motion, finding that the Corporation could not "disregard the difference between" it and Dr. Atkins personally and thus could not "use his personal salary as a basis *** to calculate the corporation's lost profits." The court did allow the Corporation to discuss "the fact that his accountants took carryover losses in determining corporate profit for some years to try to decrease the tax burden" and that "there would have been a profit in such and such year had he not taken a carryover loss."

¶ 17 In defendants' tenth motion *in limine*, they argued that, assuming *arguendo* the Corporation could prove damages, the recovery of such damages should be limited to only two years of alleged lost profits, the time period that would have been protected by the allegedly omitted restrictive covenants. The circuit court granted the motion.

¶ 18 In February 2016, the Corporation supplemented its Rule 213(f)(3) disclosure with a new report authored by Dr. Smith. In that report, Dr. Smith estimated the Corporation's lost profits by calculating its net income before officer compensation and then subtracting the value of services provided by Dr. Atkins to the business, which included his administrative work and as a practicing anesthesiologist one day per month. Dr. Smith estimated that, based on the Corporation losing the renewal of the River North center contract for the remainder of 2007 until 2009, its lost profits were approximately $3.3 million. The circuit court barred the presentment of Dr. Smith's new report as untimely.

¶ 19 The parties, however, agreed to a written stipulated offer of proof "for purposes of preserving the record" concerning Dr. Smith's excluded damages testimony. They agreed that, if Dr. Smith were called at trial, he would testify consistently with his 2012 report and deposition. They further agreed that, if he were called "at trial and not permitted to offer the opinions as expressed" in his 2012 report and deposition, he would testify consistently with his 2016 report.

¶ 20    In June 2016, approximately a week and a half before trial, defendants filed a motion to bar the Corporation from using several newly produced documents as exhibits during trial, including salary and bonus data for various employees of the Corporation as well as insurance payment data from each of the surgical centers with which the Corporation had contracts. Defendants asserted that the documents had not been produced during discovery and were produced recently only for the purpose of eliciting previously undisclosed opinions on the issue of damages. The circuit court granted defendants' motion.

¶ 21                                              B. Trial

¶ 22    At trial, Dr. Atkins testified that, in the spring of 2007, the River North center's busiest days were Tuesdays, Thursdays, and Fridays, and the Corporation would generally provide up to three anesthesiologists and one nurse anesthetist or two anesthesiologists and two nurse anesthetists on those days. In order to obtain payment from providing the anesthesia services, the Corporation's anesthesiologists and nurse anesthetists "filled" out "billing cards" for "every case," which Dr. Atkins collected. He sent the cards to a company called Medical Financial Management, who would obtain any missing insurance information from the surgical centers and then bill the insurance companies on the Corporation's behalf. Medical Financial Management collected the money from the insurance companies and remitted the money, less a 5% collection fee, to the Corporation. According to Dr. Atkins, the River North center was the Corporation's most profitable contract.

¶ 23    As far as the Corporation's expenses, Dr. Atkins stated that it paid its employees on a monthly basis, including himself. The Corporation paid him a monthly salary of $50,000. At the end of the year, he also received a bonus, which was based on "advice from [his] accountant." Dr. Atkins had the responsibility to ensure that everyone was paid properly and used the payroll system "ADP." He also performed other administrative responsibilities for the Corporation, including business development and "dealing with insurance contracts." Dr. Atkins performed the administrative functions out of his home, and as such, the business claimed a "minimal rent expense." In 2007, Dr. Atkins filled in as a practicing anesthesiologist when needed, usually working one day a month, but he would rarely work at the River North center.

¶ 24    Dr. Atkins discussed the Corporation's "Form 1120" tax returns from 2003 to 2007, which were introduced into evidence. In 2007, the Corporation reported gross profit of approximately $4.26 million. When the Corporation added its interest from a money market account of nearly $11,000, its total income for the year was $4,272,918. The Corporation took several deductions, including for its employees' salaries and wages, taxes, retirement plans, other employee-benefit programs, and a $1.05 million deduction in the form of compensation to Dr. Atkins as a corporate officer. The deductions totaled $4,291,489, leaving the Corporation with a net operating loss of $18,571. Dr. Atkins stated that the 2007 return's data only included 8½ months of anesthesia services to the River North center.

¶ 25    In 2006, the Corporation reported gross profit of approximately $4.58 million. When the Corporation added its interest from its money market account of nearly $9100, its total income for the year was $4,584,444. The Corporation again took several deductions, including for its employees' salaries and wages, taxes, retirement plans, other employee-benefit programs, and a $1.01 million deduction in the form of compensation to Dr. Atkins as a corporate officer. The

Corporation also deducted carried-over net operating losses of $133,371, leaving the Corporation with a taxable income of exactly $0.

¶ 26 Additionally, in 2005, the Corporation reported a net operating loss of $84,701 with Dr. Atkins receiving compensation as a corporate officer in the amount of $1.03 million. And in 2004 and 2003, the Corporation reported exactly $0 in taxable income with Dr. Atkins receiving compensation as a corporate officer in the amount of $1.48 million and $1.70 million, respectively. Dr. Atkins testified that his accountants "managed" the Corporation so that "there was no profit" and "no taxes to pay at a corporate level so we either had a carryover loss or a net zero gain." According to Dr. Atkins, the Corporation paid bonuses at the end of the year to himself and its employees "to realize that [financial] position."

¶ 27 Dr. Atkins also discussed the prior tortious interference lawsuit that Robbins had initially filed on the Corporation's behalf. In response to a query from Robbins's attorneys regarding the Corporation's damages, Dr. Atkins wrote them an e-mail "explaining how [he] was going to layout the damages based on a future sale *** and at a loss of income to Edward Atkins, M.D. personally due to the loss of revenue to [the Corporation]." At this point, defendants' attorney objected, asserting that the circuit court had granted their motion *in limine* to prevent the Corporation from using Dr. Atkins's "personal income" as "the basis for damages." The court responded that "I don't think—I mean, I'll be aware of that as we go into the testimony" and added that it did not "think [counsel] need[ed] to bring that motion *in limine* up."

¶ 28 Later, the Corporation's attorney asked Dr. Atkins if he had received any advice during the tortious interference lawsuit from Robbins that "you could not assert a claim for damages because you had not obtained profits at the corporate level." After Dr. Atkins responded, "[n]o," defendants' attorney objected on the grounds of relevance. The Corporation's attorney responded that the circuit court had "ruled *in limine* on the issue of damages" and, as he understood the ruling, he had "the right to try to approach the issue and then tender the evidence to your Honor." He asserted that it was improper for Robbins to prosecute a case on the Corporation's behalf on one theory of damages, then, when sued by the Corporation, argue that theory of damages was inappropriate. The Corporation's attorney further stated that "[t]his examination is the foundation for what I will then formally tender to the Court as a request to consider that evidence of damages notwithstanding the fact that they have successfully [moved] *in limine* to block it." Defendants' attorney argued that this was merely an attempt to criticize the representation of Robbins in the tortious interference case and "outside of the scope" of the present litigation. The Corporation's attorney replied that such testimony was "being elicited for purposes of adjusting" to the court's "pretrial ruling *in limine* on the sufficiency of [D]r. Smith's analysis, and in connection with that *** it is relevant to the consideration of the sufficiency of the proof of damages." The attorney again noted that Robbins prosecuted the tortious interference case on the belief that damages could be obtained despite the Corporation showing no year-end taxable income. He argued that examination on the matter was necessary so that he could "lay the foundation because there was a legitimate basis to calculate damages."

¶ 29 The circuit court asked the Corporation's attorney if he was "going to argue for reconsideration over motion *in limine* No. 7." The attorney responded that the evidence was "not through" Dr. Smith but was "a separate source of calculation independent of" him, noting that the facts underlying the calculation "had been there all along." The court ultimately ruled that it was "going to let [the Corporation's attorney] go into this but not—you know, to the

extent he has been going into it, and we'll see—we'll see what happens." The Corporation's attorney added: "And, your Honor, just we've established with [D]r. Smith, I'm not going to ask you to reconsider" because he and defendants' attorney had "worked out" a stipulated offer of proof. Defendants' attorney clarified with the court that the motions *in limine* that were granted did not "specifically" deal with Dr. Smith's "opinions as expressed." Defendants' attorney instead observed that the motions *in limine* "that were granted were the fact that the plaintiff here is the corporation and not the individual and consequently his compensation should not be part of the analysis of the damage to the corporation" as well as the one restricting the time frame for alleged damages to two years. Defendants' attorney added that the prior tortious interference case "has nothing to do with the analysis of the two years or the lack of incorporation of the compensation to Dr. Atkins personally as part of the damage." The court remarked, "[s]o noted," and asked the Corporation's attorney to continue.

¶ 30    The Corporation's attorney briefly continued questioning Dr. Atkins on the prior tortious interference case until asking him if he had "an understanding how much money [the Corporation] lost in the first year after the cessation of the" contract with the River North center. Dr. Atkins responded:

> "[The Corporation was] on a run rate in 2007. Since we had 1.7, $1.8 million in revenue in eight and a half months that puts the run rate in collective revenue at about $2.4 million. We talked about the actual expenses of the employees, and I think we went over—I think it came to nine on a weekly basis, nine anesthesiologists for a week and five nurse anesthetists for the week or four nurse anesthetists for the week actually because nothing on a Wednesday, that was a typical schedule, so if we put our—the average compensation, I believe total compensation, including salary, bonuses, benefits, profit-sharing came out to somewhere in the range of $290,000 per M.D., and it was about 150,000 plus or minus for a nurse anesthetist, so if you take those out, it would be 90—1.8 full-time equivalence for an M.D. so 1.8 times 290 or 300 or whatever and four out of 80 percent of the 155, if you just want to round up for—to make it easy, it would be 155 plus 600,000 for two M.D.s, 755—$750,000 to run—to staff River North.
>
> We mentioned before the collection fee was five percent so that was 120,000, I believe, so let's say round it up to $900,000. So 2.4 minus $900,000. In 2007 the run rate was about $1.5 million a year, and I guess you'd call it the profit to the bottom line or excess income over expenses from River North itself."

Additionally, the Corporation did not have to pay rent at the River North center.

¶ 31    Following Dr. Atkins's testimony regarding the cash-flow resulting from the River North center contract in 2007, the Corporation's attorney made an offer of proof for "appeals purposes" of the documents that had been the subject of defendants' pretrial motion to bar due to the Corporation's failure to disclose them during discovery. Afterward, the Corporation ended its examination of Dr. Atkins, and defendants waived cross-examination of him. The Corporation entered the written stipulated offer of proof concerning Dr. Smith and rested its case.[1]

---

[1] Although other witnesses testified in the Corporation's case-in-chief, the record on appeal contains the complete testimony of only Dr. Atkins.

¶ 32 Thereafter, defendants filed three motions. The first was an uncontested motion for a directed finding concerning the alleged negligence related to Dr. Gay's employment contract. Defendants asserted that the evidence showed Dr. Gay voluntarily resigned from employment with the Corporation in 2005 and subsequently was rehired later that year pursuant to an oral contract. They argued that the oral contract rendered moot any alleged liability for failing to include a postemployment restrictive covenant in Dr. Gay's 2003 written contract. The circuit court granted the motion. Defendants' second motion was for a directed finding based on the Corporation failing to present any evidence that their alleged breach of duty proximately caused it injury. The circuit court denied the motion, finding that the Corporation had "established a more-likely-than-not *prima facie* case" on the issue of proximate causation.

¶ 33 Defendants' final motion was for a directed finding on the issue of damages. In the motion, defendants raised similar arguments to those in their motion *in limine* to bar evidence of Dr. Atkins's personal compensation as evidence of the Corporation's lost profits. In particular, defendants reiterated that the Corporation could not ignore its corporate structure and had to base its alleged lost profits on the Corporation's year-end income. Defendants highlighted the Corporation's tax returns, pointing out that, between 2003 and 2007, it reported either net losses or exactly zero taxable income. Defendants argued that the tax returns showed the Corporation was not a profitable enterprise and it therefore had no legitimate claim for damages based on future lost profits. Defendants additionally posited that the Corporation did not provide a reasonable and reliable calculation for its damages, noting that it was simply "throwing out facts hoping that something's going to happen." Defendants contended that its motion could be granted on either reason: the corporate structure or an unreliable basis for such a calculation.

¶ 34 The Corporation responded, observing that the River North center was akin to "a division within" the business and arguing that its alleged lost profits could be "calculated in terms of projectable revenues minus expected costs associated with creating those revenues." The Corporation highlighted that Dr. Atkins testified to "the full-time equivalency" of anesthesiologists and nurse anesthetists to staff the River North center "in order to generate the revenues" as well as the Corporation's projected "revenue stream" from the River North center based on 2007's partial year data. The Corporation added that Dr. Atkins testified to the business's "lack of overhead" expenses and its tax returns showed a "durable income stream."

¶ 35 The court interjected, noting the excess income over expenses for the River North center, but stated that the Corporation "account[ed] for all of the expenses except for compensation of officers." The Corporation responded that, while previous accounting decisions had been made to minimize taxable income, those same decisions did not have to be made in the future. In response, the court stated that it had "to have a reasonable basis to determine the profits in the future," which "usually" involved looking at past profits. The court pointed out that the tax returns showed "the corporation had no profit or had minimal profit after all the expenses." The Corporation agreed but also pointed out that the tax returns showed "a significant seven-figure element of expense that was used to reduce corporate tax—corporate income in the past consisted of a discretionary bonus set by the owner of the corporation for himself." It argued that defendants' argument improperly assumed that this expense would remain in the future. Although the Corporation conceded that its "[o]perating profits" were nonexistent based on its past accounting practices, it asserted that defendants were conflating an "accounting decision" with the "inherent operational profitability" of the River North center.

¶ 36    Defendants replied that the Corporation still had the burden of proof to show that, based on its evidence, "there is a satisfactory, adequate, reasonable and credible damage calculation," which defendants argued it failed to do. The circuit court asked defendants to respond to the Corporation's argument concerning the bonus to Dr. Atkins being merely discretionary. Defendants responded that the Corporation had other service contracts but, beyond stating the River North center was its most profitable, there was no evidence presented breaking out the income and expenses from the other service contracts. The court wondered under defendants' argument "how would [the Corporation] ever be able to establish profitability given the compensation of officers in the past?" Defendants stated that it could not "answer that question because it hasn't been [their] burden to do so."

¶ 37    The Corporation subsequently highlighted again its evidence about the income and expenses from the River North center. It added that the Corporation does not pay rent at the surgical centers and there is "no other overhead to" obtain its revenues. All together, the Corporation argued its evidence provided the circuit court a reasonable basis to award it damages for lost profits. The court, however, noted that "[f]rom the corporation's perspective there's still the compensation of officers for overhead." Defendants then reiterated that there was still "no credible evidence" for the court to use in determining a calculation for the lost profits.

¶ 38    Thereafter, the circuit court granted defendants' motion, finding that lost profits had "to be proved with reasonable certainty" and could not be "remote or speculative." The court noted Dr. Atkins's testimony regarding the Corporation's "expenses, overhead and the 5 percent collection fee" and observed the "income" being "in excess of expenses" from the River North center. But the court observed that the Corporation did not

> "go into the compensation of officers, and there's got to be some accounting for that, and I look at the larger picture and it still seems that there is a problem with trying to distinguish the profit of the plaintiff versus the profit of, you know, the sole officer of the plaintiff, and I think I keep on running into that issue when I'm trying to determine whether or not there is a reasonable basis for lost profits."

The circuit court accordingly entered judgment in favor of defendants.

¶ 39    The Corporation did not file a posttrial motion and timely appealed.

¶ 40                                   II. ANALYSIS

¶ 41    The Corporation contends that the circuit court erred in granting defendants' motion for a directed finding on the issue of damages. Specifically, the Corporation argues that the court misapplied Illinois law and well-established federal tax law by finding that it failed to present evidence of its damages based solely on its business structure. Additionally, the Corporation argues that, although the court did not rule specifically that its evidence of lost profits was too speculative to sustain an award, its evidence was nevertheless sufficient to allow the court to calculate and award damages.

¶ 42                              A. Supreme Court Rules

¶ 43    Initially, we note that the Corporation has failed to include a "Points and Authorities" section at the beginning of its appellate brief in violation of Illinois Supreme Court Rule 341(h)(1) (eff. Nov. 1, 2017). Although harsh, we may sanction violations of our supreme

court rules by dismissing the appeal or striking an appellant's brief. *North Community Bank v. 17011 South Park Ave., LLC*, 2015 IL App (1st) 133672, ¶ 14. We do not find such a punitive sanction warranted in this case, but we remind the parties that these rules are not suggestions and must be followed. *Id.*

¶ 44                                                           B. Forfeiture

¶ 45       At the outset, defendants contend that the Corporation has forfeited review of the circuit court's decision to grant their ninth motion *in limine*, which sought to bar the Corporation from presenting evidence of Dr. Atkins's individual compensation as evidence of its alleged lost profits, because it did not raise this argument in its opening brief. Defendants therefore conclude that this forfeiture prevents the Corporation from challenging the court's ultimate determination that it failed to provide sufficient evidence of damages. Although the Corporation does not respond directly to the forfeiture argument in its reply brief, we note that, based on the record, it is unclear the court's exact actions relating to defendants' ninth motion *in limine*.

¶ 46       It is undisputed that, prior to trial, the circuit court granted defendants' ninth motion *in limine*. However, during trial is where the confusion arose. First, during Dr. Atkins's testimony, he mentioned his monthly salary of $50,000 and his bonus compensation, as demonstrated on the Corporation's tax returns, without any objection from defendants' attorney. See *Miller v. Rokita*, 131 Ill. App. 3d 774, 779 (1985) (stating that the failure of a party's attorney "to object at appropriate times to the evidence constitutes a waiver of that objection, and the evidence is given its natural probative effect and force even if the evidence is improper or generally incompetent").

¶ 47       Second, at various times during Dr. Atkins's testimony, the issue of his compensation and the Corporation's profits was raised by the Corporation's attorney. The attorney attempted to argue that, when Robbins prosecuted the tortious interference case on the Corporation's behalf, they did not see a problem asserting a damages claim despite the Corporation's tax returns showing no year-end taxable income but, in the present litigation, Robbins was using the Corporation's finances as a shield. The Corporation's attorney asserted such evidence was "relevant to the consideration of the sufficiency of the proof of damages." Although the court asked the Corporation's attorney if he was arguing "for reconsideration over [defendants'] motion *in limine* No. 7," that motion had already been denied by the court. The relevant motions that the court granted were defendants' ninth and tenth motions *in limine*, which defendants' attorney even highlighted to the court. Given the rationale by the Corporation's attorney for broaching the prior tortious interference case concerned the issue of damages despite the Corporation's tax returns showing no year-end taxable income, it appears to us that the court misspoke when referencing "motion *in limine* No. 7" and meant to ask the Corporation's attorney if he was arguing for reconsideration of defendants' ninth motion *in limine*, which, of course, the court had granted. The court ultimately ruled that it would "let [the Corporation's attorney] get into" the issue concerning the prior tortious interference case and "see what happens."

¶ 48       Additionally, following the Corporation's case-in-chief and during consideration of defendants' motion for a directed finding on the issue of damages, the circuit court mentioned multiple times the issue of compensation to an officer and ultimately remarked that it saw a problem with the Corporation "trying to distinguish the profit of the plaintiff versus the profit

of *** the sole officer of the plaintiff," an issue it kept "running into" when "trying to determine whether or not there is a reasonable basis for lost profits." This comment seems to indicate that the court considered Dr. Atkins's personal compensation as it related to the Corporation's alleged lost profits. In light of all of this, it appears that the court reconsidered its pretrial grant of defendants' ninth motion *in limine* and allowed evidence of Dr. Atkins's personal compensation to prove the Corporation's lost profits. Whether or not the court believed that Dr. Atkins's personal compensation was a proper measure to prove the Corporation's lost profits is a different question. But regardless, we find that the evidence of Dr. Atkins's personal compensation was admitted into evidence to prove the Corporation's lost profits, rendering defendants' forfeiture argument moot.

¶ 49                                  C. Legal Malpractice

¶ 50    In a cause of action for legal malpractice, the plaintiff must prove that (1) its attorney, the defendant, owed it a duty of care resulting from an attorney-client relationship; (2) its attorney breached that duty of care; and (3) as a proximate cause of the breach, it suffered an injury. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 225-26 (2006). The injury in a legal malpractice lawsuit "is a pecuniary injury to an intangible property interest caused by the lawyer's negligent act or omission." *Id.* at 226. The appropriate measure of damages puts the "plaintiff in a position he would have been had the attorney not been negligent." *Meriturn Partners, LLC v. Banner & Witcoff, Ltd.*, 2015 IL App (1st) 131883, ¶ 18.

¶ 51    The Corporation alleged its damages constituted the lost profits as a result of losing the anesthesia services contract with the River North center. In order to obtain a recovery for lost profits, the plaintiff cannot rely on "conjecture or speculation," but rather its evidence must provide a reasonable basis for the calculation of its lost profits. *Id.* "The law requires only that the plaintiff approximate the claimed lost profits by competent evidence." *Tri-G*, 222 Ill. 2d at 248. Lost profits do not have to be proven with absolute certainty because, as "[b]eing merely prospective, such profits will, to some extent, be uncertain and incapable of calculation with mathematical precision." (Internal quotation marks omitted.) *Id.* However, the plaintiff's "evidence must with a fair degree of probability tend to establish a basis for the assessment of damages for lost profits." *Id.* The plaintiff bears the burden of presenting evidence to provide a reasonable basis for the calculation of its alleged lost profits. *Meriturn*, 2015 IL App (1st) 131883, ¶ 18. If the plaintiff proves it is entitled to damages but does not "provide a proper basis for computing those damages, only nominal damages can be recovered." *Keno & Sons Construction Co. v. La Salle National Bank*, 214 Ill. App. 3d 310, 312 (1991).

¶ 52                                  D. Standard of Review

¶ 53    In a bench trial, section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2016)) allows the defendant to make a motion for a directed finding at the close of the plaintiff's case. To rule on such a motion, the circuit court must engage in a two-step analysis. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). Initially, the court must decide whether the plaintiff has presented a *prima facie* case as a matter of law or, in other words, determine whether it has produced some evidence of every element necessary to its cause of action. *Id.* If the plaintiff has failed to do so, the court should grant the motion and enter judgment in favor of the defendant. *Id.*

¶ 54    If the plaintiff has succeeded, the circuit court must then consider the totality of the evidence presented, by weighing it, determining the credibility of witnesses, and drawing any reasonable inferences, and ultimately conclude whether the plaintiff's *prima facie* case survives. *Id.* at 275-76. If sufficient evidence exists to establish the plaintiff's *prima facie* case, the court should deny the defendant's motion and continue the trial. *Id.* at 276. If sufficient evidence does not exist, the court should grant the motion and enter judgment in favor of the defendant. *Id.* Generally, if the court grants the motion at the first step of the section 2-1110 analysis, our standard of review is *de novo*, whereas if the court grants the motion at the second step, our standard of review is the manifest-weight standard. *Id.* at 275-76.

¶ 55    The parties dispute the applicable standard of review. The Corporation argues that our review should proceed *de novo* because the circuit court found that it failed to establish a *prima facie* case as a matter of law based on its view of the "inherent nature" of a single-shareholder professional corporation. Defendants argue that our review should be under the manifest-weight standard because the court considered the sufficiency of the Corporation's evidence and scrutinized whether it presented a reasonable basis to calculate the alleged lost profits, thus reaching the second step of the section 2-1110 analysis. Both parties are partially right.

¶ 56    In this case, the circuit court observed the Corporation's evidence of its "expenses, overhead," and the 5% collection fee from Medical Financial Management, as well as its evidence of the income and expenses involved in servicing the River North center, but noted that it did not account for "the compensation of officers." Directly after this comment, the court remarked that it had to look at the "larger picture" and found a problem in "trying to distinguish the profit of the plaintiff versus the profit of *** the sole officer of the plaintiff." The court concluded that this problem manifested itself when it tried to determine whether or not there was a reasonable basis for lost profits. Although in *Prodromos v. Everen Securities, Inc.*, 389 Ill. App. 3d 157, 170 (2009), cited by defendants, we stated that, when the court states it has considered the evidence, it "has engaged in the second step of its [section 2-1110] analysis and has necessarily found the plaintiff has met the first step of the analysis by presenting a *prima facie* case," we do not believe the court truly engaged in a weighing of the relevant evidence. Merely observing evidence presented is not the same as weighing it.

¶ 57    So while the circuit court may have reached the second step of section 2-1110 analysis, its ruling was more akin to one of law, *i.e.*, that because the Corporation was itself unprofitable, there was no legal basis for any lost profits despite Dr. Atkins being highly compensated as an employee. Because the court evidently focused on the issue of compensation to Dr. Atkins versus the profitability of the business, the court never truly considered whether the Corporation's evidence competently provided a reasonable basis for the calculation of its lost profits. Notably, when denying defendants' motion for a directed finding on the issue of proximate causation, the court stated that the Corporation had "established a more-likely-than-not *prima facie* case." In other words, the Corporation's *prima facie* case had survived. In contrast, the court did not use similar language when considering defendants' motion for a directed finding on the issue of damages. Consequently, although the court reached the second step of the section 2-1110 analysis, its ruling was as a matter of law, resulting in our review proceeding *de novo*. See *Ferris, Thompson & Zweig, Ltd. v. Esposito*, 2017 IL 121297, ¶ 5 (questions of law are reviewed *de novo*).

¶ 58                              E. The Corporation's Corporate Form

¶ 59        Before discussing whether the circuit court erred as a matter of law in finding that a Corporation with no taxable income could not prove damages for lost profits, we briefly discuss the Corporation's structure and how it filed its tax returns, which are necessary for a full understanding of this legal question.

¶ 60        When the Corporation was formed in 1984, it did so under the Medical Corporation Act (Act), which can be gleaned from its corporate name using the letters "S.C." See Ill. Rev. Stat. 1983, ch. 32, ¶ 634 (stating that a company organized under the Medical Corporation Act shall include in its name its choice of designators, including "the abbreviation 'S.C.' "). The Act allows one or more physicians licensed under the Medical Practice Act of 1987 (225 ILCS 60/1 *et seq.* (West 2016)) to form a corporation "for the study, diagnosis and treatment of human ailments and injuries, whether physical or mental, and to promote medical, surgical and scientific research and knowledge." 805 ILCS 15/2 (West 2016). The Act requires all officers, directors and shareholders of such a corporation to be licensed under the Medical Practice Act of 1987. *Id.* § 13.

¶ 61        The legislation allowing for the incorporation of professional businesses "arose 'out of the desire of professional groups to realize the tax benefits open to employees under the qualified pension, profit-sharing, and annuity plan provisions of the Internal Revenue Code.' " *Riggs v. Woman to Woman, Obstetrics & Gynecology, P.C.*, 351 Ill. App. 3d 268, 272 (2004) (quoting J.F. Rydstrom, *Practice by Attorneys and Physicians as Corporate Entities or Associations Under Professional Service Corporation Statutes*, 4 A.L.R. 3d 383, 385 (1965)). Additionally, incorporating a professional business reduces the potential for civil liability. *Id.* To this end, the Act limits the personal liability to only "the physician 'furnishing medical service.' " *Fure v. Sherman Hospital*, 55 Ill. App. 3d 572, 574 (1977) (quoting Ill. Rev. Stat. 1973, ch. 32, ¶ 644); see 805 ILCS 15/14 (West 2016) (containing the same language as paragraph 644 of chapter 32 of the Illinois Revised Statutes of 1973).

¶ 62        Additionally, it is also important to understand the Corporation's tax returns. Under section 162(a) of the Internal Revenue Code of 1986 (26 U.S.C. § 162(a) (2006)), corporations are allowed to deduct all "ordinary and necessary expenses" in operating a business from their taxable income, including compensation in the form of salaries or bonuses to its employees subject of course to various rules. See 26 C.F.R. §§ 1.162-7, 1.162-9 (2007). Corporations may also generally deduct net operating losses from previous years. 26 U.S.C. § 172 (2006). Thus, deductions decrease a corporation's taxable income. *Id.* § 161.

¶ 63        The Corporation's tax returns from 2003 to 2007 showed that, after the Corporation deducted its employees' salaries, the compensation paid to Dr. Atkins as a corporate officer, and its other business expenses, it had either a net operating loss or exactly $0 in taxable income. This is not a coincidence but rather the manner in which the Corporation operated itself. Dr. Atkins testified that the Corporation's accountants managed the business to achieve this year-end financial position of "no profit" and thus "no taxes to pay at a corporate level." Dr. Atkins further testified that the Corporation gave its employees and him bonuses commensurate with the amount necessary to reduce its taxable income to zero.

¶ 64        Certain corporations have an incentive to conduct themselves in this manner to avoid double taxation on their income. When the Corporation filed its tax returns from 2003 to 2007, it did so using a "Form 1120," meaning it treated itself as a subchapter C corporation (see 26 C.F.R. § 1.6012-2(a)(3) (2007)), rather than a subchapter S corporation, in which case it would

have had to make an election under the Internal Revenue Code and file its tax returns using a "Form 1120-S." *Id.* § 1.6037-1(a). The distinction between the two corporate forms is important. A subchapter S corporation is a pass-through entity that does not pay taxes at the corporate level. *In re Marriage of Joynt*, 375 Ill. App. 3d 817, 820 (2007). On the other hand, a subchapter C corporation pays taxes at the corporate level. *Id.* Because the Corporation was a subchapter C corporation, it was first subject to taxation on its income at the corporate level (see 26 U.S.C. § 11 (2006)), and then, any dividends were subject to taxation at the individual level. See *id.* §§ 1, 61(a)(7). If Dr. Atkins had been compensated in his role as the shareholder of the Corporation, the money distributed to him would have been taxed once already at the corporate level. Then, the money would be taxed a second time at the individual level as dividends distributed to him.

¶ 65        On the other hand, where Dr. Atkins was solely compensated in his role as an employee and officer of the Corporation in the form of a salary and bonus, he was subject to taxation once, at the individual level. See *id.* §§ 1, 61(a)(1); 26 C.F.R. § 1.61-2(a)(1) (2007). Thus, the Corporation's accounting practices were specifically designed to avoid double taxation of income. See *Mulcahy, Pauritsch, Salvador & Co. v. Commissioner of Internal Revenue*, 680 F.3d 867, 869-70 (7th Cir. 2012) (explaining that corporations are incentivized to characterize compensation to shareholders as salaries and bonuses rather than dividends because salaries and bonuses are deductible as business expenses and thus result in an overall net financial benefit to the shareholders due to the avoidance of double taxation).

¶ 66                                        F. Lost Profits

¶ 67        With that background in mind, we turn to the critical issue on appeal, whether as a matter of law a corporation with no taxable income could ever prove damages for lost profits. Although both parties recognize that lost profits are at issue, neither has provided us with a definition or formula to ascertain them. Nevertheless, we observe that the calculation of damages for lost profits is based on "net profit[ ]." *Sterling Freight Lines, Inc. v. Prairie Material Sales, Inc.*, 285 Ill. App. 3d 914, 918 (1996). "Net profit," however, does not appear to have a consistent formulation. For instance, our supreme court once described "net profit" as " 'what shall remain, as clear gains of any business venture, after deducting the capital invested in the business, the expenditures incurred in its conduct, and the losses sustained in its prosecution.' " *Neeson v. Sangamon County Mining Co.*, 316 Ill. 397, 400 (1925) (quoting *Park v. Grant Locomotive Works*, 3 A. 162, 167 (N.J. Ch. 1885)). Our appellate courts have defined the term as generally "determined by computing the difference between gross profits and the expenses that would be incurred in acquiring such profits." *Dempsey v. Sternik*, 147 Ill. App. 3d 571, 579 (1986); see *Hemken v. First National Bank of Litchfield*, 76 Ill. App. 3d 23, 27 (1979) (same). According to Black's Law Dictionary, "net profit" means the "[t]otal sales revenue less the cost of the goods sold and all additional expenses." Black's Law Dictionary 1404 (10th ed. 2014). Though these formulations differ slightly in terminology, what is clear from them is that, in order to ascertain the "net profit" of a business venture, all expenses must be considered.

¶ 68        In this case, Dr. Atkins testified that, based on the 2007 "run rate," the contract with the River North center produced revenue of roughly $2.4 million with expenses of approximately $900,000, leaving the Corporation with $1.5 million of, in his words, "excess income over expenses." On its face, this figure would seem to be the lost profits from losing the River North

center contract. However, such a simplistic view would ignore the Corporation's accounting practices, as demonstrated through its tax returns from 2003 until 2007, which showed that it intentionally never reported any taxable income because it gave bonuses to its employees and Dr. Atkins commensurate with the amount necessary to reduce its taxable income to zero. This accounting practice by the Corporation lies at the heart of this case.

¶ 69 The Corporation argues that such compensation and its accounting practices were proper because, like most professionals who are both shareholders and employees of corporations, Dr. Atkins avoids double taxation by compensating himself with a bonus at the end of the year from the Corporation's pretax revenues, thus reducing its taxable income to zero. However, the Corporation asserts that using its year-end taxable income fails to realistically reflect its actual financial situation and would seriously undermine any such corporation's ability to prove damages. Defendants, meanwhile, argue that, where Dr. Atkins incorporated his business, he obtained the benefits of the corporate form, such as limited liability and tax advantages, but also the disadvantages. They posit that he cannot ignore the form when convenient and the tax returns demonstrably showed that the Corporation was unprofitable.

¶ 70 In essence, the parties' arguments can be boiled down to a simple question: How should the compensation of an employee of a professional corporation who also happens to be a shareholder be treated when determining the corporation's net profit? The parties cite no cases directly on point, and our research reveals no Illinois law directly on the matter. However, we have found two competing lines of cases directly on point. Illustrative of the Corporation's argument is the case *Bettius & Sanderson, P.C. v. National Union Fire Insurance Co.*, 839 F.2d 1009, 1014 (4th Cir. 1988), wherein the Fourth Circuit held that compensation paid to principals of a professional corporation, who also happen to be shareholders, tends to prove the corporation's net profit and thus is relevant evidence for the purpose of proving damages for lost profits. In so holding, the Fourth Circuit found that professional corporations and traditional business corporations are dissimilar in structure and exist for different purposes. *Id.* at 1012-13.

¶ 71 In a traditional business corporation, the shareholders own part of the corporation but do not partake in its day-to-day operations. *Id.* at 1013. Such a business pays salaries to its employees, deducts those amounts as well as other expenses from its gross profit, and is left with a net profit that either is distributed to the shareholders as dividends or is retained by the business as retained earnings. *Id.* In this kind of corporation, the "[e]mployees and shareholders are therefore treated as separate groups of people." *Id.* However, in a professional corporation, "the principals and shareholders are not treated as separate groups of people," and the shareholders themselves are actively involved in the day-to-day affairs of the business. *Id.* In light of this fact, the Fourth Circuit found that a professional corporation and a traditional business corporation "calculate their net incomes with different goals in mind." *Id.*

¶ 72 A traditional business corporation developed to accommodate both employees and shareholders who are not employees, so what money remains as net profit is distributed to the shareholders as dividends. *Id.* Even though this results in double taxation of income, once at the corporate level and again at the shareholder level, this consequence is acceptable "because the corporate form is essential for the acquisition of capital to finance a business whose employees and shareholders are in theory, and often in fact, not the same." *Id.* But this consequence is not acceptable to a professional corporation where "the shareholders and the principals are, in fact, one and the same." *Id.* Instead, a professional corporation wishes "to

disburse its earnings in order to avoid having income taxes imposed twice on what is in reality the same group of people—the principals who are required by law to be both shareholders and professional employees." *Id.* To this end, a professional corporation disburses "all or most of its earnings to the principals as compensation before calculating the professional corporation's net income." *Id.* While this disbursement usually results in the professional corporation's taxable income being zero or close to zero, "it is unrealistic to suggest that the corporation is not earning a profit." *Id.* Thus, according to the Fourth Circuit, using a professional corporation's year-end taxable income as its net profit for that year is a misleading representation of its actual finances, and to find otherwise would result in professional corporations "rarely, if ever," showing net profit despite their shareholders being highly compensated as principals. *Id.*

¶ 73      In arriving at this conclusion, the Fourth Circuit recognized that, due to incorporation, a professional corporation obtains certain tax advantages and limited liability protections, but nevertheless determined that, if a professional corporation was viewed in the same manner as a traditional business corporation, it would unlikely ever be able to show lost profits in the event of the wrongful act of another. *Id.* at 1013-14.

¶ 74      Meanwhile in *Anesthesiologists Associates of Ogden v. St. Benedict's Hospital*, 884 P.2d 1236 (Utah 1994), the Supreme Court of Utah effectively adopted the position advocated by defendants. There, a professional corporation of anesthesiologists sued a hospital for a breach of contract to provide the hospital with anesthesia services. *Id.* at 1237. Relying on the decision in *Bettius*, the appellate court of Utah determined that a professional corporation could recover lost profits based on the anticipated salaries that would have been paid to its shareholders in their roles as employees even though the corporation itself showed little net profit. *Id.* at 1237-38. Rejecting the reasoning and application of *Bettius*, the Supreme Court of Utah reversed the appellate court and held that the compensation to shareholders in their roles as employees could not be considered as part of the corporation's lost profits. *Id.* at 1240. In doing so, the court relied on three key reasons.

¶ 75      First, the Supreme Court of Utah refused to justify the disparate treatment of professional corporations compared to traditional corporations merely because the former were made up of professionals. *Id.* at 1238-39. Second, the court observed that, in some professional corporations, there are a large number of nonshareholding associates and the appellate court of Utah offered "no guidelines for determining what ratio of shareholders to employees a professional corporation must maintain for shareholders and employees to be considered 'virtually the same persons.' " *Id.* at 1239. Third, the Supreme Court of Utah found that many closely held nonprofessional corporations have shareholders and employees who are virtually the same people and similarly manage their corporations to result in no year-end taxable income, yet the appellate court of Utah failed to explain why professional corporations should be treated differently than these closely held corporations. *Id.* at 1239-40. All told, the Supreme Court of Utah found that when professionals decide to incorporate, "they assume[ ] all the attendant advantages as well as the disadvantages of the corporate form." *Id.* at 1240.

¶ 76      We additionally note that, in *Sisters of Providence in Washington v. A.A. Pain Clinic, Inc.*, 81 P.3d 989, 1006 (Alaska 2003), the Supreme Court of Alaska observed the split of authority in *Bettius* and *Anesthesiologists Associates* but followed the reasoning of *Bettius* because its "line of thinking better reflects actual losses of a professional corporation."

¶ 77 After reviewing the cases, we find that the approach enunciated in *Bettius* more appropriately reflects the losses that a professional corporation suffers as a result of wrongdoing. We agree that, when professionals incorporate, they assume the advantages of such incorporation as well as the disadvantages, but to agree with *Anesthesiologists Associates* would allow a windfall to wrongdoers merely because the professional corporation has decided to run its business in the most tax-efficient manner, *i.e.*, avoiding double taxation. The law did not develop to allow such a boon to wrongdoers. Professional corporations should be allowed to operate themselves in a tax-efficient manner and still be able to pursue claims for lost profits based on alleged torts, breaches of contract, and other civil wrongs.

¶ 78 In arriving at this conclusion, we find *Bevelheimer v. Gierach*, 33 Ill. App. 3d 988 (1975), cited by defendants, unpersuasive. There, a corporation and its president, who also happened to be its sole shareholder, sued its attorney for allegedly failing to renew a lease of the business. *Id.* at 990. Following a jury trial, the corporation was awarded damages constituting lost profits, and its president was awarded damages constituting lost wages. *Id.* at 991-92. On appeal, the attorney argued that the president was not a proper party to the litigation. *Id.* at 992. In finding that the president as the shareholder of the corporation had no cause of action for lost wages, the appellate court remarked that, "even if all the stock of a corporation is owned by one person, the corporation is an entity different from that of the stockholder" and further that "one who has created a corporate entity will not be permitted to disregard it to gain an advantage which under it would be lost." *Id.* at 992-94. In contrast to *Bevelheimer*, Dr. Atkins did not personally sue Robbins for lost wages but instead sought to use his compensation as a means to show corporate lost profits. Furthermore, as noted in *Bettius*, professional corporations are special, and to prevent the shareholders of such corporations from using their compensation as employees as a means to prove lost profits would have a chilling effect on such corporations ever being able to show lost profits based on the tort of another.

¶ 79 Furthermore, we decline to consider defendants' argument that the Corporation appeared "to have improperly claimed all of its net revenue as compensation to corporate officers, rather than declaring it as a non-deductible dividend." Defendants are correct that this issue is commonplace when shareholders of corporations set their own salaries. See *Home Interiors & Gifts, Inc. v. Commissioner of Internal Revenue*, 73 T.C. 1142, 1156 (1980) ("Where officers-shareholders, who are in control of a corporation, set their own compensation, careful scrutiny is required to determine whether the alleged compensation is in fact a distribution of profits."). However, the reasonableness of Dr. Atkins's compensation is not at issue in this appeal and clearly not one we can ascertain in the first instance.

¶ 80 In light of our adoption of the *Bettius* approach, we find the circuit court erred when it found as a matter of law that the Corporation could not demonstrate its alleged lost profits based on the Corporation itself being unprofitable yet Dr. Atkins being highly compensated personally as an employee. Although the court reached the second step of an analysis under section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2016)), the court clearly struggled with the internal paradox of awarding lost profits to an unprofitable corporation so as to not truly consider the totality of the evidence presented by the Corporation. With this cloud lifted, we believe the proper course is to allow the court to properly perform its fact-finding function under section 2-1110 by weighing the evidence, determining the credibility of the witnesses, drawing any reasonable inferences, and concluding whether the plaintiff's *prima facie* case survives. See *Cryns*, 203 Ill. 2d at 275-76. In this manner, the court

can determine whether the Corporation satisfied its burden of presenting evidence to provide a reasonable basis for the calculation of its alleged lost profits notwithstanding the fact that the Corporation was unprofitable. See *Meriturn*, 2015 IL App (1st) 131883, ¶ 18. Given this factual determination must be made in the first instance by the court, the proper remedy in this case is to remand the matter to the circuit court for this purpose (see *Village of Carpentersville v. Pollution Control Board*, 176 Ill. App. 3d 668, 674 (1988)) and proceedings consistent with that eventual ruling.

¶ 81     We further reject defendants' reliance on *Med+Plus Neck & Back Pain Center, S.C. v. Noffsinger*, 311 Ill. App. 3d 853, 860 (2000), for the proposition that the Corporation could not prove its damages with reasonable certainty because it failed to present evidence of its overhead expenses. Here, when granting defendants' motion for a directed finding on the issue of damages, the court observed that the Corporation had presented evidence of "expenses, overhead and the 5 percent collection fee." Furthermore, as defendants acknowledge, the Corporation's tax returns from 2003 to 2007 were admitted into evidence. While it is not clear from the trial transcript if the entire return for each year was admitted, we note that, in the tax returns included as exhibits to defendants' motions *in limine*, the full tax return, including various statements, is included.[2] On the first page of each return, it shows the Corporation took a deduction for "[o]ther deductions," which, according to an attached statement, included expenses related to utilities, insurance premiums, legal and accounting, office supplies, and professional development, among other areas of the business. These items are clearly some of the overhead expenses for the Corporation as a whole. The weight to be afforded to this evidence, however, in determining whether the Corporation provided a reasonable basis for the calculation of its alleged lost profits from losing the contract with the River North center is certainly an issue the court should confront on remand, assuming the entire tax return had been admitted into evidence.

¶ 82     Defendants' reliance on *Santorini Cab Corp. v. Banco Popular North America*, 2013 IL App (1st) 122070, for the proposition that the Corporation presented no competent evidence of its alleged lost profits is likewise misplaced. There, the circuit court granted a defendant's partial motion for summary judgment precluding damages for lost profits. *Id.* ¶ 10. On appeal, this court affirmed the grant because a witness of the plaintiff had been barred from testifying "about lost profits 'off the top of his head without having any backup documents' " and, thus, the only evidence the plaintiff had produced during litigation were two years of tax returns and "random checks" for two later years. *Id.* ¶¶ 10, 20. In contrast to *Santorini*, during the Corporation's trial, Dr. Atkins testified about its various income and expenses from servicing the River North center and other operational financial information. While parts of his testimony were off the top of his head and without reference to any documents, this evidence was for the court to consider and give whatever weight it felt was appropriate, another issue it may confront on remand.

¶ 83     Defendants additionally argue that we may affirm the judgment of the circuit court on the alternative basis that the Corporation's theory of proximate cause was premised upon mere speculation. Specifically, defendants assert that the Corporation failed to present any evidence

---

[2]When defendants recount the evidence presented by the Corporation at trial in their statement of facts, specifically the "revenue and profits," they cite the tax returns included as exhibits to their motions *in limine*.

concerning the reasons it was not awarded the contract with the River North center and thus, it improperly resorts to speculation that, absent the competition from Dr. Gay and Dr. Sukhani's company, it would have been awarded the contract.

¶ 84 We note that, following the Corporation's case-in-chief, defendants moved for a directed finding on this issue, which the court denied. Although defendants argue that the record fully supports their motion for a directed finding on the issue of proximate cause, we decline to address this argument. The record on appeal does not contain the full transcript of the trial, only the entirety of Dr. Atkins's testimony and part of the testimony of Wolf. Although generally the appellant, here the Corporation, has the burden to provide a sufficient record on appeal (see *Webster v. Hartman*, 195 Ill. 2d 426, 432 (2001)), the Corporation is obviously not claiming error in the court's denial of defendants' motion for a directed finding on the issue of proximate causation. "Appellees may not argue alleged errors unless they timely file a cross-appeal," and when they fail to, "the reviewing court is confined to the issues presented by the appellant." *Martis v. Grinnell Mutual Reinsurance Co.*, 388 Ill. App. 3d 1017, 1024 (2009). Accordingly, we will not address defendants' argument that the court erred in denying their motion for a directed finding on the issue of proximate causation.

¶ 85 Lastly, we briefly mention the circuit court's grant of defendants' tenth motion *in limine*, which limited the Corporation's alleged damages to only two years of lost profits, the time period that would have been protected by the allegedly omitted restrictive covenants. Although the Corporation has not claimed any error in this ruling, we nevertheless find it was proper. See *Prairie Eye Center, Ltd. v. Butler*, 329 Ill. App. 3d 293, 304 (2002) (finding that the circuit court properly found an expert witness's evidence of lost profits sufficient to provide a reasonable basis to calculate and award damages and properly reduced the witness's calculation by $100,000 "to coincide with the proper time period in which [the defendant] had violated the [restrictive] covenant"). Therefore, if on remand, the circuit court finds that the Corporation is entitled to damages for lost profits, the court should proceed consistently with its original ruling that such damages must be confined to only a two-year period of time.

¶ 86                                        III. CONCLUSION

¶ 87 For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand the matter with directions.

¶ 88 Reversed and remanded with directions.