# Illinois Official Reports

## Appellate Court

*Meriturn Partners, LLC v. Banner & Witcoff, Ltd.*, 2015 IL App (1st) 131883

| | |
|---|---|
| Appellate Court Caption | MERITURN PARTNERS, LLC, MERITURN FUND MANAGEMENT, LLC, MERITURN FUND, LP, SSI INVESTORS, LLC, and SSI HOLDCO, INC., Plaintiffs-Appellees and Cross-Appellants, v. BANNER AND WITCOFF, LTD. and JOSEPH BERGHAMMER, Defendants-Appellants and Cross-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-13-1883 |
| Filed | April 28, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-3985; the Hon. William J. Haddad, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Donohue Brown Mathewson & Smyth LLC (Karen Kies DeGrand and Matthew J. Hammer, of counsel), both of Chicago, for appellants.<br><br>Williams Montgomery & John Ltd., of Chicago (Michael C. Bruck, Megan A. Rees, and Alyssa M. Reiter, of counsel), for appellees. |
| Panel | PRESIDING JUSTICE SIMON delivered the judgment of the court, with opinion.<br>Justices Neville and Liu concurred in the judgment and opinion. |

## OPINION

¶ 1     This is a legal malpractice case in which a jury found that the plaintiffs were entitled to a judgment of $6 million. Defendants appeal arguing that they should be made to pay less; plaintiffs' cross-appeal arguing that they are entitled to more. We affirm the judgment entered by the trial court.

¶ 2                                    BACKGROUND

¶ 3     Plaintiff Meriturn Partners, LLC, is a private equity company. Meriturn, together with other individuals and companies, invests in troubled businesses, attempting to turn them around for a profit. Defendant Joseph Berghammer is an attorney who specializes in the area of intellectual property and is employed by defendant Banner & Witcoff, Ltd., a law firm.

¶ 4     In 2005, Meriturn began to explore an investment in a company called Sustainable Solutions, Inc. Sustainable Solutions was in the business of repurposing industrial waste into usable products. Lee Hansen, one of the founders of Meriturn, took the most active role on the Meriturn side of the undertaking. After conducting a preliminary investigation into the sensibility of the investment, Meriturn and Sustainable Solutions agreed on a "term sheet" that outlined the general terms of the proposed transaction. However, a final decision on whether to invest was reserved until more thorough due diligence could be conducted. Meriturn retained Jeffrey Hechtman, an attorney, to structure and oversee the transaction. Because Sustainable Solutions' business relied on a number of proprietary processes that were the subject of patents, Hechtman recommended that Meriturn retain counsel that regularly worked on intellectual property matters. Hechtman recommended Berghammer of Banner & Witcoff to Lee Hansen and introduced them to each other.

¶ 5     After an initial consultation, Berghammer agreed to perform due diligence on certain intellectual property issues involved in the proposed transaction. In a letter to Hansen, Berghammer memorialized the initiation of the representation and set forth the basic terms of the parties' relationship. The letter refers only to the representation of Meriturn Partners, LLC. However, Meriturn's typical investment strategy was to arrange and manage a transaction in which some of the money from its fund would be invested along with some of its individual clients' money. For this particular transaction, Meriturn Fund was to commit $3 million of its money and the other $3 million was to come from an investor group represented by Walter McCormack and Cary Steinbeck. The structure of the transaction required the creation and utilization of multiple business entities. While due diligence was being performed by Berghammer, there were certain instances in which Berghammer communicated with the representatives of the investor group, such as on conference calls and via email. The parties dispute whether Berghammer was fully aware of the structure of the transaction and of the role played by the outside investor group. The main issue in this appeal is whether Berghammer and Banner & Witcoff represented only Meriturn in its portion of the investment or if they also represented the outside investor group.

¶ 6     Banner & Witcoff undertook the patent review, and the research into the patents was principally assigned to Paul Rivard, a partner at Banner & Witcoff. This transaction was Rivard's first or second patent due diligence project. Eventually, Banner & Witcoff communicated to Meriturn that all of the patents at issue in the transaction were owned and controlled by Sustainable Solutions. Relying on this advice, Meriturn went forward with the

investment. A new business entity was formed that encapsulated Meriturn's takeover of the previous iteration of Sustainable Solutions.

¶ 7 Lee Hansen became chairman of the board of the new iteration of Sustainable Solutions. Soon after the transaction was completed, it was learned that Joy Nunn, the owner of the prior iteration of Sustainable Solutions and the president of the new company, was engaged in double-dealing and other misdeeds. It was also soon learned that one of the patents, the '179 patent, was owned by Nunn's in-laws and not Sustainable Solutions, and that Banner & Witcoff's legal advice was, therefore, erroneous. The company quickly faltered and lost a potential business opportunity with a company called SEM. Sustainable Solutions' proposed venture with SEM would have purportedly included a $23 million investment by SEM resulting in multimillion dollar, internally projected royalties each year for Sustainable Solutions. However, plaintiffs allege that, upon learning that Sustainable Solutions did not own the '179 patent, the proposed venture fell apart.

¶ 8 This case followed. The case was tried to a jury that returned a verdict in the plaintiffs' favor for $6 million. Defendants appeal the judgment arguing that they only represented Meriturn and, therefore, that they are not liable for the $3 million loss incurred by the outside investor group. Defendants also argue that the investment was not totally lost and that there was undisputed evidence that some residual value of the investment remained. Plaintiffs' cross-appeal arguing that they are entitled to a new trial on the issue of lost profits because the negligent acts of defendants deprived them of the gains that would have been realized from this or another investment.

¶ 9 ANALYSIS

¶ 10 We must first determine whether the plaintiffs other than Meriturn Partners, LLC, itself are entitled to recover for legal malpractice committed by defendants. Defendants maintain that Banner & Witcoff agreed to represent Meriturn and Meriturn only. To prevail on a legal malpractice claim, a plaintiff must prove the existence of an attorney-client relationship with the defendant. *USF Holland, Inc. v. Radogno, Cameli & Hoag, P.C.*, 2014 IL App (1st) 131727, ¶ 53. To form an attorney-client relationship, both the attorney and the client must consent to its formation. *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 13 (2009). Consent can be express or implied. *Zych v. Jones*, 84 Ill. App. 3d 647, 651 (1980). A client cannot unilaterally create the relationship, and the putative client's belief that the attorney is representing him is only one consideration. *Rosenbaum v. White*, 692 F.3d 593, 601 (7th Cir. 2012). However, if an attorney knows that a person is relying on his performance of services and he performs for that person's benefit without limitation, an attorney-client relationship can be found. Restatement (Third) of the Law Governing Lawyers § 14 (2000). Whether an attorney-client relationship exists, and thus whether the attorney owes a duty to a particular person, is a question of law. *Blue Water Partners, Inc. v. Mason*, 2012 IL App (1st) 102165, ¶ 38. However, findings of fact often must be made concerning the formation of the attorney-client relationship to, for example, resolve disputes concerning communications, acts undertaken, or the parties' respective understandings. See, *e.g.*, *Hotze v. Daleiden*, 229 Ill. App. 3d 301, 306-09 (1992).

¶ 11 The written retention agreement at issue in this case was expressly between Meriturn Partners, LLC, and defendants. Accordingly, the plaintiffs other than Meriturn were required to prove that defendants orally agreed to the representation or assented by other conduct.

Defendants argue that plaintiffs presented no evidence that Berghammer did anything to indicate he represented anyone other than Meriturn itself. Berghammer testified that he had never heard of the other named plaintiffs until this litigation began and that he never agreed to represent anyone other than Meriturn. Although there were conference calls and emails between Berghammer and individuals other than Hansen, Berghammer testified that he simply understood the other people to be part of Meriturn.

¶ 12        On the other hand, Hechtman, the lawyer leading the transaction, testified that he was fully aware that he represented Meriturn and the outside investor group and that he told Berghammer about the structure of the transaction. Hechtman testified that he notified Berghammer that defendants were providing representation for the entire transaction and that he gave Berghammer the background of some of the investors. Lee Hanson similarly testified that he explained the mechanics of the transaction to Berghammer and informed Berghammer that other investors were going to be involved. Hanson testified that Berghammer was retained to perform the intellectual property work for the entire transaction. Berghammer also gave legal advice on conference calls and in emails to the representatives of the outside investor group that were reportedly introduced to him as investors.

¶ 13        The evidence shows that Berghammer consented to perform services for the transaction as a whole, not just for Meriturn. He knew that other investors were going to be involved and knew that their investment was dependent on his work. Despite being told of the existence of other investors and their obvious interest in his performance of services, Berghammer never attempted to limit the scope of the representation to only Meriturn's investment activity. Berghammer knew that there were investors on a conference call in which he gave legal advice and never expressed any concern about exchanging confidential information. Berghammer also claimed to have expertise in the area of intellectual property due diligence in the context of targeting companies so, considering the circumstances, when he was specifically advised about the structure of the transaction, he should have known that his legal advice was flowing to people outside of Meriturn. The trial court denied defendants' motion to dismiss and their motion for a judgment notwithstanding the verdict on the basis that no attorney-client relationship existed. To the extent that it matters, it is clear that any factual disputes were resolved against defendants. The trial court did not err by finding that Berghammer owed a duty to the investors other than Meriturn.

¶ 14        Even if we had found that no attorney-client relationship existed between defendants and the outside investors, those plaintiffs could recover on the basis that they were known third-party beneficiaries to the undisputed attorney-client relationship between Meriturn and defendants. If a nonclient is an intended third-party beneficiary of the relationship between the client and the attorney, the attorney's duty to the client may extend to the non-client as well. *In re Estate of Powell*, 2014 IL 115997, ¶ 14. The key consideration in determining whether an attorney owes a duty to a nonclient third party is whether the attorney is acting at the direction of or on behalf of the client to benefit or influence a third party. *Id.*

¶ 15        Here, because the aim of the representation was to provide advice about patent ownership for the entire transaction, defendants' duty extended to the outside investors who were to directly benefit from defendants' services. Defendants knew or should have foreseen that a breach of the requisite duty of care would result in a loss for both Meriturn and the outside investors. There was evidence introduced at trial that Berghammer even directly gave some of the outside investors legal advice. It is undisputed that defendants were retained to provide

legal services concerning the entire $6 million investment. Thus, defendants were at least acting at the direction of Meriturn for the benefit of the investors and, therefore, defendants have no legal basis to escape liability when, knowing the structure of the transaction, they performed services for the entire transaction without limitation.

¶ 16       Defendants also argue that the trial court erred when it did not reduce the jury award of $6 million by the salvageable value of the company. Defendants maintain that there was undisputed evidence introduced at trial that demonstrated that the salvage value of the investment was $345,000. Plaintiffs, however, introduced evidence that the investment was completely lost. The jury heard defendants' argument and the evidence defendants believed supported that proposition and the jury rejected it. A jury's award of damages will not be disturbed unless it bears no reasonable relationship to the loss suffered. *Newbrough v. Lockwood Dairy*, 223 Ill. App. 3d 665, 669 (1992). In this case, the jury's verdict reflects that it sided with the plaintiffs and found that the investment was a total loss. The jury resolved the proximate causation question of fact in plaintiffs' favor–finding that the malpractice committed by defendants caused a $6 million loss. The jury was entitled to reject the evidence offered concerning the salvage value. Even if there was some residual value at the time the company began to deteriorate, it would not have been against the manifest weight of the evidence for the jury to project, based on the evidence presented, that the loss was ultimately everything that was invested. There was evidence to support the amount of the jury's award and, thus, the trial court did not err by entering judgment in the amount of the jury verdict.

¶ 17       In a cross-appeal, plaintiffs contend that they are entitled to a new trial on the issue of lost profits. Plaintiffs presented two lost-profit theories in the trial court: an alternative investment theory and a sales projection theory. The trial court granted a motion *in limine* in defendants' favor concerning the sales projection theory which precluded plaintiffs from presenting that theory at trial. The trial court allowed plaintiffs to go forward on their alternative investment theory and, after presenting evidence on that theory at trial, the jury awarded plaintiffs no damages for lost profits.

¶ 18       The proper measure of damages in a legal malpractice case puts a plaintiff in a position he would have been had the attorney not been negligent. *Gaylor v. Campion, Curran, Rausch, Gummerson & Dunlop, P.C.*, 2012 IL App (2d) 110718, ¶ 61. Recovery of lost profits cannot be based upon conjecture or speculation, and the evidence must afford a reasonable basis for the computation of damages. *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 143 Ill. App. 3d 168, 174 (1986). The plaintiff bears the burden of proving lost profit damages to a reasonable degree of certainty. *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 284 Ill. App. 3d 417, 426 (1996). The existence and amount of damages in a legal malpractice case is a question for the jury, and great weight must be given to the jury's determination. *Union Planters Bank, N.A. v. Thompson Coburn LLP*, 402 Ill. App. 3d 317, 356 (2010).

¶ 19       The alternative investment theory was predicated on the idea that, had defendants discovered Sustainable Solutions' nonownership of the '179 patent, plaintiffs would not have invested in Sustainable Solutions and they would have made profits by investing the money elsewhere. In support of their alternative investment theory, plaintiffs offered the expert testimony of Lawrence Levine. Levine opined that the jury should award damages for lost profits in this case in an amount equal to Meriturn's average rate of return over the history of its investments.

¶ 20     The jury was entitled to reject plaintiffs' theory that they would have made as much on this or another investment as they had made on previous investments. The jury was not required to find that, based on past performance, this or any other investment plaintiffs might have made would have made any money at all. Meriturn lost 51% on one of its investments and 87% on another. Some investments make money and some do not. There are countless things that could have gone right or wrong during the course of the new venture. Conditions vary with each endeavor and a trier of fact is not required to assume that a particular venture will be profitable. *Drs. Sellke & Conlon*, 143 Ill. App. 3d at 174-75; see also *Resolution Trust Corp. v. Stroock & Stroock & Lavan*, 853 F. Supp. 1422, 1429 (S.D. Fla. 1994) (holding that lost profit damages were not available to a client that received poor investment advice from his attorney because there was no basis for concluding what the client would have done as an alternative to the chosen investment and, therefore, there was no basis for predicting whether any such alternative investment would have produced greater or lesser returns than the chosen investment).

¶ 21     While average past investment returns might be related to the future returns on another investment in some cases, there is no rule that requires a jury to conflate the two. Scott Stringer testified as an expert on defendants' behalf that Levine's methodology was flawed. Stringer stated that, in the context of this case, the results of previous investments were not reliable indicators of the result of a future investment. Stringer testified that, for example, Levine totally failed to account for the economic downturn from 2007 to 2012, right at the time that this investment was made. When expert witnesses present conflicting opinions, it is the province of the jury to resolve the disputes. *Matthews v. Aganad*, 394 Ill. App. 3d 591, 599 (2009). Evidence was also introduced from which the jury could have found that, while defendants' malpractice caused the initial investment to be lost, it was not the proximate cause of any future losses. For example, the jury might have concluded the company would not have ultimately been profitable based on the double-dealing and other deceitful actions of Nunn rather than the nonownership of the patent. In 2007, the only year for which actual profits and losses were measured, Sustainable Solutions had nearly a $4 million operating loss. There is also evidence in the record that SEM, the company with which Sustainable Solutions was to partner and make millions of dollars per year, went bankrupt the following year. The jury was free to conclude that the malpractice caused the loss of the investment but that some factor other than defendants' negligence justified a finding that lost-profit damages were not warranted.

¶ 22     The sales projection theory was predicated on the idea that had Sustainable Solutions actually owned the '179 patent, plaintiffs would have obtained profits from the operations of Sustainable Solutions. Plaintiffs claim that they should have at least been able to present evidence of their internally projected profits from the investment or of the projections for the proposed venture with SEM that deteriorated as a result of Sustainable Solutions not owning the patent.

¶ 23     Because the trial court ruled that plaintiffs could not recover under this theory as a matter of law, we review its decision *de novo*. *McWilliams v. Dettore*, 387 Ill. App. 3d 833, 844 (2009). The trial court essentially relied on the "new business rule" to conclude that plaintiffs were not entitled to lost profits under this theory. The new business rule precludes expert speculation about possible lost profits where there is no historical data to demonstrate a likelihood of future profits. *SK Hand Tool*, 284 Ill. App. 3d at 427. The idea is that a business

must have been established before it is interrupted so that the evidence of lost profits is not speculative. *Id*.

¶ 24 Plaintiffs contend that neither Meriturn nor Sustainable Solutions was a new business. That is true, but the venture for which they seek profits was a new business. The result plaintiffs seek requires a number of assumptions to be made in their favor. In fact, the projections that plaintiffs claim support their right to lost profits are all future suppositions. They were possible. Not probable nor reasonably certain. This case deals with an unestablished venture that sought to go to market with an unestablished product using an unestablished process. The trial court did not err by precluding plaintiffs from presenting evidence on their sales projection theory.

¶ 25 Put simply, we will never know whether Sustainable Solutions would have been profitable had it simply owned the '179 patent. It never was. Perhaps it was a losing investment as others had been for Meriturn. There is no evidence that convinces us that it was reasonably certain that Sustainable Solutions would have been successful. The jury was charged with assessing an amount of damages that, in its estimation, it believed flowed from defendants' negligence. We see no reason to disturb the result at which it arrived.

¶ 26 Accordingly, we affirm.

¶ 27 Affirmed.