# Illinois Official Reports

## Appellate Court

---

**Ivey v. Transunion Rental Screening Solutions, Inc., 2021 IL App (1st) 200894**

---

| | |
|---|---|
| Appellate Court Caption | ROGER IVEY and HELIX STRATEGIES, LLC, a Limited Liability Company, Plaintiffs-Appellants, v. TRANSUNION RENTAL SCREENING SOLUTIONS, INC., Defendant-Appellee. |
| District & No. | First District, First Division<br>No. 1-20-0894 |
| Filed | October 18, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-L-13423; the Hon. Michael F. Otto, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael I. Zweig, of Ferris, Thompson & Zweig, Ltd., of Chicago, and Jason R. Bendel, of Bendel Law Group, of Los Angeles, California, for appellants.<br><br>Christopher T. Sheean, Erica Bury, and Edward J. Keating, of Swanson, Martin & Bell, LLP, of Chicago, for appellee. |

PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Coghlan concurred in the judgment and opinion.
Justice Walker dissented, with opinion.

**OPINION**

¶ 1    Roger Ivey formed Helix Strategies, LLC (Helix), to create and sell customizable lease forms, a product, according to Ivey, unavailable in the rental market. Defendant Transunion Rental Screening Solutions (TURSS) entered into a nonexclusive marketing agreement with Ivey to build a platform to sell the leases on its website. After delays of nearly five years, TURSS decided not to build the platform or sell Helix's leases. Ivey and Helix sued TURSS, alleging breach of contract, fraud, and promissory estoppel and seeking over $23 million damages. The trial court dismissed the fraud claim with prejudice, finding Helix could not establish (i) the elements of promissory fraud, including TURSS's intent to defraud; (ii) Helix's reasonable reliance; or (iii) proximate causation. The trial court also granted summary judgment for TURSS on the breach of contract claim, finding Helix's damages as too speculative.

¶ 2    After the trial court denied Helix's motion to reconsider and granted TURSS's motion for a final judgment, Helix appealed, arguing that the trial court erred in (i) granting summary judgment on the breach of contract claim due to the speculative nature of the damages, (ii) denying nominal damages and attorney's fees, and (iii) dismissing the fraud claim.

¶ 3    We affirm. The trial court did not err in finding Helix's damages were too speculative as, under the new business rule, Helix could not present evidence estimating actual sales of its new, customizable leases. The trial court also did not err in declining to proceed to trial on nominal damages or in denying Helix's request for attorney's fees. Further, the trial court correctly dismissed the fraud claim where Helix failed to present facts showing TURSS acted with the intent to defraud.

¶ 4                                    I. BACKGROUND

¶ 5    Helix is a Colorado limited liability company formed to provide residential property management lease forms and related services to landlords and other property management companies. Ivey serves as its president and chief executive officer. TURSS is a Delaware corporation with offices in Illinois and a subsidiary of the credit reporting agency Transunion, LLC. TURSS provides consumer credit and background screening services to property management companies and landlords. TURSS developed two Internet platforms to offer its screening services: MySmartMove.com, a website directed at small portfolio landlords, and CreditRetriever, directed to larger, professional commercial customers.

¶ 6    In 2007, Ivey worked as the assistant vice president and property operations counsel of UDR, Inc., a publicly-traded real estate investment trust. At the time, only one meaningful electronic lease product for landlords existed: a "one size fits all" lease the National Apartment Association (NAA) made available to its dues-paying members. Recognizing a need, Ivey met with Michael Britti, vice president of TURSS, to discuss the possibility of TURSS building an online platform to sell a customizable, electronic lease form that Ivey would create. In

September 2008, Ivey left UDR to form Helix, purportedly based on assurances from Britti that TURSS would build the online platform no later than mid-2009.

## A. The Marketing Agreement

In March 2009, Helix and TURSS entered into a five-year marketing agreement that required TURSS to build an online platform for Helix's lease documents. TURSS would receive 35% of "all collected revenue (excluding any taxes) generated" from the sale of Helix's leases, and Helix would receive 65%.

The marketing agreement created no obligations of exclusivity, stating: "Nothing in this Agreement shall prevent Helix from independently marketing and selling its products to and through any and all third parties, including, without limitation, to TURSS' Subscribers and competitors, without obligation to TURSS ***." Also, TURSS could partner with other vendors to provide similar forms to TURSS customers. The marketing agreement included this specific limitation of liability:

> "In no event shall either party be liable for any consequential, incidental, indirect, special, or punitive damages incurred by the other party and arising out of the performance of this agreement including, but not limited to, loss of goodwill and lost profits or revenue, whether or not such loss or damage is based in contract, warranty, tort, negligence, strict liability, indemnity or otherwise, even if a party has been advised of the possibility of such damages. These limitations shall apply notwithstanding any failure of essential purpose of any limited remedy ***. TURSS shall not be liable for any and all claims arising out of or in connection with this agreement brought more than twelve (12) months after the cause of action has accrued. Except as otherwise set forth above, the parties' (together with their respective parents' and affiliates') total liability under this agreement shall not exceed the aggregate amount of TURSS' revenue share paid by Helix, under this agreement, during the twelve month (12) month [sic] period immediately preceding such claim. The foregoing limitations of liability shall not apply in the event and to the extent a party is harmed by the willful or intentional, wrongdoing of the other party." (Emphasis omitted).

## B. Project Delays

Despite TURSS's repeated assurances that a platform for Helix's leases was in development, the project experienced extensive delays until shelved in 2014.

In August 2009, Britti left TURSS. His replacement, Mike Mauseth, regularly spoke with Ivey about TURSS's progress on the electronic platform. In September 2009, a TURSS business analyst told Ivey that TURSS would complete the platform by year's end. It did not.

In February 2010, Mauseth and other TURSS employees told Ivey that TURSS had not yet "allocated sufficient resources to complete the platform," but "was committed to building the platform and selling Helix services ***." TURSS later asserted, falsely Ivey contends, that the delays occurred because TURSS had to devote considerable time and resources to rebuilding its CreditRetriever and MySmartMove platforms due to stability problems.

In March 2010, TURSS agreed to amend the marketing agreement, extending it another five years from the date TURSS would offer the Helix lease documents for sale. The amendment added that TURSS anticipates that "the software platform(s) provided for in the

Agreement and the Helix Services will be made available for purchase by TURSS' Subscribers approximately in June 2010 (without making any specific guarantee regarding this date)." It also stated, "The extension of the Agreement will not be construed as an approval by Helix of unreasonable delays, if any, by TURSS in performance of the Agreement."

¶ 15   Ivey made numerous inquiries with TURSS in 2010 and 2011. Delays continued. Helix, meanwhile, worked on developing its product and marketing it to other companies. Helix entered into agreements with two other companies but made no sales.

¶ 16   On January 5, 2012, Ivey spoke with Mauseth and Timothy Martin from TURSS. Both reiterated TURSS's commitment but advised of delays into 2013. A few weeks later, Martin sent Ivey a follow-up letter, explaining that he had reviewed the marketing agreement and discussed the project with the TURSS team. "Based on that review," Martin wrote, "I am confident that TURSS is complying with its contractual obligations and acting in good faith and, to date, has spent significant time" developing the software platform, which continued to "be in the TURSS development queue, though other priorities, including system stability, have taken precedence. This extended timeframe has been reasonable. A system that includes forms but is not stable is not in anyone's interest."

¶ 17   After more delays, Ivey contacted TURSS in October 2014. The employees he reached knew nothing about the marketing agreement and, in an email exchange, stated, "no one is left at TURSS who was involved in the Helix project."

¶ 18                                   C. Procedural History

¶ 19   On July 20, 2015, Helix and Ivey filed a four-count complaint against TURSS. Count I, brought by Helix, alleged "willful and intentional'' breach of contract. Counts II, III, and IV, brought by Ivey and Helix, alleged, respectively, fraud, negligent misrepresentation, and promissory estoppel. TURSS filed a motion for summary judgment on all counts. After a hearing, the trial court granted summary judgment for TURSS as to counts I, III, and IV. The court found, relevant here, that the "exception to the limitations period for willful or intentional wrongdoing doesn't apply to breach-of-contract actions," adding that, "the one-year limitations contained in paragraph 11 of the contract dooms the action for breach of contract" because based "on the evidence before the court, there is no genuine issue of material fact that, according to plaintiff's allegations, this cause of action for breach of contract accrued well before the one year Helix filed its complaint."

¶ 20   The court found count II, alleging fraud, inadequate as a matter of law because it did not specifically identify the facts underlying the claims. But rather than granting TURSS's motion for summary judgment, the trial court *sua sponte* struck the fraud claim and allowed Helix leave to replead. As to negligent misrepresentation, the trial court barred the claim under the Moorman doctrine. Finally, on promissory estoppel, the court ruled the claim "firmly rooted in contract law and isn't willful or intentional as those terms are used under Illinois law."

¶ 21   Helix filed a motion to reconsider the entry of summary judgment on their claims for breach of contract and promissory estoppel. While the motion to reconsider was pending, Helix filed a three-count, first amended complaint alleging breach of contract (count I), fraud (count II), and promissory estoppel (count III). But Helix did not replead the claims for breach of contract and promissory estoppel to preserve those issues for review.

¶ 22    TURSS filed a combined motion to dismiss under section 2-619.1 of the Code of Civil Procedure. 735 ILCS 5/2-619.1 (West 2020). TURSS argued that the fraud claim remained legally and factually deficient under section 2-615 (*id.* § 2-615) and asked the trial court to dismiss all of the counts under section 2-619(a)(9) (*id.* § 2-619(a)(9)) as time-barred and for lack of damages.

¶ 23    After briefing and argument on both motions, the trial court granted Helix's motion to reconsider, in part, but proceeded to dismiss all claims in the amended complaint with prejudice. Specifically, the trial court concluded that although a genuine issue of material fact existed regarding whether Helix filed the claims within one year of learning of the alleged breach of contract, Helix had failed to identify recoverable damages. The court explained,

> "this breach of contract action, I believe, still falls squarely within the ambit of the limitations of liability provision in the contract, damages limitations and all, so compensatory damages are barred, and any damages recoverable—or the only damages recoverable are the aggregate amount of TURSS' revenue share paid by Helix under the contract during the 12-month period immediately preceding such claim. In that case, that would be zero. So[,] the breach of contract action is still doomed ***."

¶ 24    In dismissing the fraud count under section 2-619, the trial court stated the complaint and the exhibits refute the promissory fraud theory that the defendant had no intent to honor its contract from the onset and undermines other elements of fraud, including reasonable reliance and proximate cause.

¶ 25    Helix appealed. Another panel of this court dismissed the appeal without reaching the merits, finding that the order had not definitively disposed of all claims, and included no grounds for an appeal under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). *Ivey v. Transunion Rental Screening Solutions, Inc.*, 2018 IL App (1st) 171592-U.

¶ 26    On remand, TURSS moved for final judgment. Simultaneously, Ivey filed a motion asking the trial court to reconsider its ruling on Helix's breach of contract claim and Ivey's promissory estoppel claim based on the holding in *Home Healthcare of Illinois, Inc. v. Jesk*, 2017 IL App (1st) 162482, issued during the appeal. The *Jesk* court found that parties were free to agree to exclude willful misconduct or gross negligence from the scope of a limitation of liability provision. *Id.* ¶ 45. Relying on *Jesk*, Helix argued they could avoid the limitation on liability provision by proving TURSS committed willful or intentional wrongdoing.

¶ 27    The trial court denied TURSS's motion for final judgment and granted Helix's motion to reconsider on Helix's breach of contract claim, leaving open the issue of whether Helix could state a claim for damages. But the trial court denied the motion to reconsider the promissory estoppel claim and dismissed it with prejudice.

¶ 28    The case then proceeded on Helix's sole remaining breach of contract claim with Ivey removed as a plaintiff. On September 6, 2019, TURSS moved for summary judgment on Helix's breach of contract claim, arguing that Helix did not sufficiently prove actual damages. In addition, TURSS contended, in part, that Helix's alleged contract damages, consisting solely of purported lost profits, were too speculative under Illinois's "new business rule."

¶ 29    In support of its argument of lost profit damages, Helix submitted reports from two experts, Paul Jay Cohen and Dr. Stan V. Smith. Cohen concluded, "if TURSS had performed in accordance with the parties' Marketing Agreement," Helix would have made over $102,936,075 over five years. Smith looked at market data and the NAA's annual revenue

from its National Lease Programs to issue a report concluding Helix's total lost revenue during the five-year contract was $42,949,247, and $120,530,266 to $145,586,153 during the 10 years immediately after the parties entered into the nonexclusive contract. Helix also cited *Milex Products, Inc. v. Alra Laboratories, Inc.*, 237 Ill. App. 3d 177 (1992), which permitted a plaintiff new to the generic drug business to recover lost profits based on expert testimony detailing actual sales of the generic drug in the marketplace, which "was based upon fact, not speculation." *Id.* at 192.

¶ 30 After argument, the trial court granted summary judgment for TURSS, stating:

"The *Milex* case is clearly distinguishable to me. The leases here are—the leases that Helix sought to market were designed from the outset to be different than the NAA—different from the NAA leases on which the experts sought to base their calculations of the profits Helix may have lost.

I just believe that the expert projections were too speculative under the New Business Rule to allow to go to a jury. I'll note as well that *Milex* is somewhat *sui generis*. It's perfectly understandable why the plaintiffs relied on it. It's the best case for them by far. But what was going on there, the generic drugs by my reading of the case, the Appellate Court allowed it because the products were identical, and they found that the sales from these other two companies were sufficient to establish a rational basis for calculations of the lost profit."

¶ 31 Helix filed a motion to reconsider; TURSS filed a motion for entry of final judgment. Helix opposed the motion, asserting it should recover nominal and out-of-pocket damages as well as attorney's fees. TURSS argued that no Illinois court has allowed a case to proceed to trial on the possibility of recovering nominal damages.

¶ 32 After briefing and argument, the trial court denied Helix's motion to reconsider and granted TURSS's motion for a final judgment. The trial court entered a written order disposing of all matters, closing the case.

¶ 33                                   II. ANALYSIS
¶ 34                              A. Standards of Review
¶ 35 We review a trial court's grant of summary judgment *de novo*. *Argonaut Midwest Insurance Co. v. Morales*, 2014 IL App (1st) 130745, ¶ 14. For summary judgment, the movant must show (i) no triable issue of material fact exists and (ii) entitlement to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2020). Genuine issues of material fact involve disputed material facts or, if undisputed, facts from which reasonable persons might draw different inferences. *Id.* This court may affirm a trial court's grant of summary judgment on any basis appearing in the record regardless of the trial court's reasoning. *Harlin v. Sears Roebuck & Co.*, 369 Ill. App. 3d 27, 31-32 (2006).

¶ 36 A motion to dismiss a claim based on section 2-619 admits the legal sufficiency of the plaintiff's allegations but asserts affirmative matter that avoids or defeats the claim. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006). On review, we accept well-pled facts as true and construe the facts in the light most favorable to the nonmoving party. *Krozel v. Court of Claims*, 2017 IL App (1st) 162068, ¶ 13. We review a trial court's section 2-619 dismissal *de novo*. *Grady v. Illinois Department of Healthcare & Family Services*, 2016 IL App (1st) 152402, ¶ 9.

¶ 38    Helix contends that the trial court erred in precluding them from proving damages.

¶ 39    In a breach of contract case, a plaintiff must " 'establish an actual loss or measurable damages resulting from the breach in order to recover.' " *In re Illinois Bell Telephone Link-Up II & Late Charge Litigation*, 2013 IL App (1st) 113349, ¶ 19 (quoting *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 149 (2005)). A plaintiff's failure to prove damages entitles the defendant to judgment as a matter of law. *Westlake Financial Group, Inc. v. CDH-Delnor Health System*, 2015 IL App (2d) 140589, ¶ 39. The plaintiff must establish a reasonable basis for computing damages. *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 130 (2008). The proper measure of damages is the amount necessary to place the nonbreaching party into the position it would have been in had the defendant properly performed. *In re Illinois Bell*, 2013 IL App (1st) 113349, ¶ 19. While absolute certainty is not required, the plaintiff must prove damages with reasonable certainty without resort to conjecture or speculation. *Id.*

¶ 40    The "new business rule" precludes expert witnesses from speculating about possible lost profits where no historical data demonstrates a likelihood of future profits. *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 284 Ill. App. 3d 417, 427 (1996). Courts applying this rule allow recovery for "profits lost due to a business interruption or tortious interference with a contract," but require the business be "established before the interruption so that the evidence of lost profits is not speculative." *Id.*; see also *Meriturn Partners, LLC v. Banner & Witcoff, Ltd.*, 2015 IL App (1st) 131883, ¶ 23. "The reason for the rule is that a new business has yet to show what its profits actually are." *SK Hand Tool Corp.*, 284 Ill. App. 3d at 427. Moreover, "[a]s lost profits are frequently the result of several intersecting causes, the plaintiff must show with reasonable certainty that the defendant's conduct caused a specific portion of the lost profits." *Id.*

¶ 41    Whether an entity is a "new business" for purposes of the new business rule depends on a track record of profits to assess estimates of alleged lost profits. See *Meriturn Partners, LLC*, 2015 IL App (1st) 131883, ¶ 23 (new business rule applies "where there is no historical data to demonstrate a likelihood of future profits"); *SK Hand Tool Corp.*, 284 Ill. App. 3d at 427 (new business rule turns on whether business has been profitable in past). "There is no inviolate rule that a new business can *never* prove lost profits." (Emphasis in original.) *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 249 (2006). Indeed, courts have opted not to apply the rule when damages were "neither speculative nor the product of conjecture, but [were] based upon a reasonable degree of certainty." See, *e.g.*, *Milex*, 237 Ill. App. 3d at 192.

¶ 42    Helix relies primarily on *Milex* to support its argument that its damages are not speculative or barred by the new business rule. Milex sought to market and sell a generic version of the fertility drug Clomid, which had an expiring patent. Milex's generic drug would have the identical active ingredient as Clomid. *Id.* at 179. Milex, a new pharmaceutical company, entered into an exclusive contract with Alra Laboratories to manufacture the generic drug for Milex. *Id.* at 180-81. When Alra reneged, Milex sued for lost profits. *Id.* at 181. Milex introduced expert testimony about the profits it contended it lost from the breach. Among other things, the expert considered the price of the pharmaceuticals, the total number of prescriptions in the market, and the average size of a prescription. *Id.* at 184-85. The trial court entered a $3.27 million judgment for Milex, which accounted for Milex's lost profits and other damages.

The court found that although the generic drug was a new product, Milex's expert witnesses showed that the product had an established market. *Id.* at 187.

¶ 43    In affirming, the appellate court refused to apply the new business rule because Milex's expert provided credible testimony demonstrating an established market for the active ingredient through the performance of two competitors selling generic versions. This provided "a reasonable degree of certainty" of lost profits. *Id.* at 193. The court noted precedent for not applying the new business rule where it "did not fit the circumstances" and found the rule inapplicable when the new business' product has an established market.

¶ 44    The appellate court cited three cases where the new business rule did not fit the circumstances. *Id.* at 192. Each case involved lost profits awards based on actual profits made by another party operating the actual business at issue throughout the period of the alleged breach or business interruption. See *Malatesta v. Leichter*, 186 Ill. App. 3d 602, 621 (1989) (plaintiff was wrongfully prevented from acquiring an existing car dealership; the new business rule did not apply, and the actual profits of a person who instead operated dealership during the time in question were not too speculative because the business was established throughout business interruption); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 552 (7th Cir. 1986) (plaintiffs were wrongfully prevented from owning and operating the Chicago Bulls; plaintiffs' lost profits were not speculative, as the team continued to operate in hands of another whose profits during relevant period could guide assessing damages); *Rhodes v. Sigler*, 44 Ill. App. 3d 375, 380 (1976) (plaintiff was wrongfully prevented from using farmland to grow crops for year; actual crops grown by defendants on same farmland during year were valued to determine lost profits); see also *SK Hand Tool Corp.*, 284 Ill. App. 3d at 428 (recognizing that cases cited in *Milex* involved awards "based on actual profits made by established, profitable businesses" and distinguishing cases cited in *Milex* because facts before court involved alleged lost profits based on hypothetical profits).

¶ 45    Helix contends that, as in *Milex*, it presented expert testimony of lost profits with a reasonable degree of certainty to preclude the new business rule. Specifically, Helix maintains that its expert, Cohen, presented evidence of the profits of a similar business, the NAA, and its lease product while Smith analyzed data from the United States Census Bureau's American Housing Survey to determine the actual market for the lease product. According to Helix, this evidence of lost profits established damages or, at minimum, created a question of fact regarding damages to preclude summary judgment. We disagree.

¶ 46    Unlike the actual demand for a generic drug in *Milex*, Helix does not base its alleged lost profits on actual sales of another entity operating a comparable business. Instead, Helix's only comparison is to the NAA lease, a product Helix acknowledges as vastly different. Indeed, from the outset, Helix intended to create a new lease product "with many unique qualities" as an alternative to NAA's lease. In an affidavit and at his deposition, Ivey identified shortcomings with the NAA lease that Helix intended to resolve. These shortcomings included that the NAA lease (i) contained provisions "very unique" to Texas law; (ii) was expensive, only available to dues-paying members, and charged fees for each page and the lease software; (iii) averaged a length of over 20 pages; (iv) provided only a limited number of forms; (v) could not be customized; (vi) failed to update quickly; and (vii) contained provisions unfavorable to landlords. In addition, the NAA platform had become "unpredictable and cumbersome" and had not been integrated with other services. Helix's expert, Cohen, also

identified ways that Helix's lease differed from and improved on the NAA lease, which he described as a flawed and inferior product.

¶ 47　Moreover, Ivey testified that the Helix leases not only differed from NAA concerning the products' characteristics but also amounted to "a different animal in a lot of ways," including the TURSS platform on which the leases would be sold. As Helix's experts noted, as a not-for-profit organization, NAA was "not in the business of selling leases," and its lease product "is merely a product they offer to their members," not to the public. In contrast, Helix would sell its leases for profit on TURSS's rental screening website. TURSS had not sold electronic lease products on its platforms, whether from Helix, the NAA, or other entities. Though the NAA had marketing agreements with TURSS and other companies, it sold leases on its website only after customers became NAA members.

¶ 48　In light of the undisputed facts regarding the differences between the NAA and Helix lease products, the lost profit analysis differs "inherently" from that in *Milex*. See *TAS Distributing Co. v. Cummins Engine Co.*, 491 F.3d 625, 635 (7th Cir. 2007). So, we agree with the trial court's well-reasoned treatment of *Milex*.

¶ 49　Helix contends, however, that neither *Milex* nor its progeny requires comparison to an identical business or product to apply an exception to the new business rule. Instead, Helix asserts, a plaintiff needs to present evidence of profits from "similar" or "comparable" products, and NAA's product meets that standard. Helix relies on *Antrim Pharmaceuticals LLC v. Bio-Pharm, Inc.*, 310 F. Supp. 3d 934 (N.D. Ill. 2018) as "persuasive authority."

¶ 50　Like *Milex*, *Antrim* involved alleged lost profits from sales of a generic pharmaceutical drug. The plaintiff's expert established damages by analyzing the generic drug's established market and actual sales. The defendant contended that the plaintiff's expert opinion regarding lost profits of its new business could not be relied on because the plaintiff was a "virtual business," unlike the other companies the expert analyzed. The trial court rejected that argument, stating,

> "[n]othing in *Milex* suggests that the sort of identity of structure or functioning that Bio-Pharm advocates is required. The relevant comparison in *Milex* is between the plaintiff's claimed lost profits and the profits of other similar businesses, using 'actual products in the marketplace as well as authoritative sources for the data [that the expert] used.' " *Id.* at 946 (quoting *Milex*, 237 Ill. App. 3d at 192).

The court denied the defendant's motion for summary judgment, concluding that the defendant did not establish that plaintiff's supposed status as a "virtual company" undermined the validity of the expert's comparison between businesses.

¶ 51　Helix contends that, similarly, it need not present evidence of profits of an identical business or product to find that its lost profits are not speculative and that its experts established its lost profits with reasonable certainty. But the "virtual business" in *Antrim* did not refer to the plaintiff's marketing, sales platform, method of sale, or product. Instead, it referred to something irrelevant in assessing lost profit, the plaintiff's corporate structure. *Id.* Conversely, as noted, Helix's leases and the NAA lease and their selling platforms differ markedly.

¶ 52　Alternatively, Helix argues that because Ivey had been creating lease products for years and TURSS had been selling third-party leases, neither qualified as a "new business." But the new business rule has nothing to do with the date of a company's launch; it applies unless a company can present evidence of past, actual profits from which to assess estimates of alleged

lost profits. See *Kinesoft Development Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 909 (N.D. Ill. 2001) (past successes related to other businesses or products provide insufficient basis to find plaintiff's claims fall outside scope of Illinois's new business rule).

¶ 53    Helix suggests that the new business rule has been "discredited" and is no longer good law, citing *Parvati Corp. v. City of Oak Forest*, 709 F.3d 678 (7th Cir. 2013). But *Parvati* involved a misuse of the new business rule. Indeed, the court described the city's invocation of the rule as "perverse."

¶ 54    The plaintiff in *Parvati* alleged that the defendant city employed racially discriminatory zoning. In *dicta*, the court said,

> "[t]he rule is based on the correct observation that it is more difficult to establish loss objectively when a business is strangled in its cradle, for then there is no history of profit and loss from which to extrapolate lost future profit—the profit the business would have earned had it not been killed or wounded by the defendant. But it doesn't make sense to build on this insight a flat prohibition against awarding damages in such a case; the general standard governing proof of damages, which requires a plaintiff to make a reasonable estimate of its damages as distinct from relying on hope and a guess, is adequate for cases in which a new business is snuffed out by a wrongdoer." *Id.* at 685.

¶ 55    The trial court here said nothing about a "flat prohibition," but that Helix's evidence of alleged lost profits was too speculative to reach a jury. Further, Illinois courts have continued to recognize the new business rule, notwithstanding *Parvati*'s *dicta*. See, *e.g.*, *Meriturn Partners, LLC*, 2015 IL App (1st) 131883.

¶ 56    The dissent contends that we misconstrue the new business rule by requiring "proof of actual profits for effectively identical products" and no cases impose similar exacting standards, relying on *Schatz v. Abbott Laboratories, Inc.*, 51 Ill. 2d 143, 147-48 (1972). *Infra* ¶¶ 83-84. But *Schatz*, which did not involve the new business rule and has no applicability here, made the unremarkable observation that "absolute certainty" as to lost profits is not required. *Schatz*, 51 Ill. 2d at 147. We agree. Helix was required to present proof of its damages to "a reasonable degree of certainty," which, as we've noted, it failed to do.

¶ 57    Further, to contend Helix met its burden on damages, the dissent cites a 45-year-old federal district court case, *Perma Research & Development Co. v. Singer Co.*, 402 F. Supp. 881, 889 (S.D.N.Y. 1975), *aff'd*, 542 F.2d 111 (2d Cir. 1976). Again, the dissent's case misses the mark. There, the inventor of a newly patented anti-skid device sued the patent assignee for breaching a contract to use best efforts to market the product. The trial court found the defendant's projected sales for the device provided a rational basis for calculating the lost profits because the defendant relied on those figures in deciding to enter the contract. Although one of Helix's experts cited TURSS's projected sales in his estimate, he relied on several other factors as well. More importantly, neither party presented evidence showing reliance on the estimate in deciding to enter into the contract. Further, in *Perma Research*, while newly patented, comparable devices were sold in the market. Conversely, as noted, Helix created a "different animal" from anything then available.

¶ 58                              C. Out-of-Pocket and Nominal Damages

¶ 59        Nevertheless, Helix contends that the trial court erred in granting summary judgment on its breach of contract claim because, at minimum, it should recover out-of-pocket and nominal damages.

¶ 60        As a preliminary matter, TURSS contends Helix waived the issue by not raising it in response to the motion for summary judgment. We deem issues not raised in the trial court waived. See *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865, 872-73 (2005). Helix, however, raised the issue at the hearing on the motion for summary judgment, so we reject TURSS's contention. *Boatmen's Bank of Benton v. Durham*, 203 Ill. App. 3d 921, 925 (1990) (an affirmative defense raised during summary judgment hearing was not waived).

¶ 61        But still, Helix failed to present sufficient evidence to support its request for "modest out-of-pocket expenses." The plaintiff has the burden to present evidence of each element of its claim, including damages. See *Ollivier v. Alden*, 262 Ill. App. 3d 190, 196 (1994) ("As the party seeking to recover, the plaintiff bears the burden of proving that he or she sustained damages resulting from the breach and establishing both the correct measurement of damages and the final computation of damages based on that measurement."). Helix failed to meet this burden.

¶ 62        At his deposition, Ivey said Helix's damages included "out-of-pocket costs," among other purported damages, but Helix provided no evidence detailing the amount. A conclusory statement like Ivey's does not provide a sufficient basis to establish (i) Helix sustained damages, (ii) the damages resulted from a breach of contract, or (iii) a proper measurement of those damages. While damages do not need to be calculated with mathematical precision, basic contract theory requires reasonable certainty and precludes damages based on conjecture or speculation. *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 106-07 (2006).

¶ 63        Absent evidence of damages, we will not reverse to permit the recovery of nominal damages. *Mayster v. Santacruz*, 2020 IL App (2d) 190840, ¶ 47. Thus, the trial court correctly entered summary judgment on Helix's breach of contract claim.


¶ 64                                      D. Attorney Fees

¶ 65        Helix seeks attorney fees under section 13 of the marketing agreement, which provides, "The prevailing party will be entitled to recover reasonable attorneys' fees and other actual and reasonable costs in enforcing this agreement."

¶ 66        To award fees, a party can be considered a "prevailing party" when it "is successful on any significant issue in the action and achieves some benefit in bringing suit [citation], receives a judgment in his favor [citation] or by obtaining an affirmative recovery." *Grossinger Motorcorp, Inc. v. American National Bank & Trust Co.*, 240 Ill. App. 3d 737, 753 (1992). A party does not have to succeed on all claims to be considered the prevailing party. *Peleton, Inc. v. McGivern's, Inc.*, 375 Ill. App. 3d 222, 227 (2007) (citing *Powers v. Rockford Stop-N-Go, Inc.*, 326 Ill. App. 3d 511, 515 (2001)). On the other hand, " 'when the dispute involves multiple claims and both parties have won and lost on different claims, it may be inappropriate to find that either party is the prevailing party.' " *Id.* at 227-28 (quoting *Powers*, 326 Ill. App. 3d at 515).

¶ 67        Helix asserts that it qualifies as the "prevailing party" because the trial court rejected TURSS's arguments that (i) the marketing agreement did not impose a duty to perform, (ii) it

could not have breached the contract because there was no deadline for performance, and (iii) the limitations of liability provision in the marketing agreement insulated TURSS from any breach of contract claim.

¶ 68 We disagree. Helix did not prevail on any significant issue, given that TURSS obtained summary judgment on the breach of contract claim and had the fraud claim dismissed with prejudice. Helix maintains that it benefited from bringing the lawsuit due to the ruling that TURSS had a duty to perform, which may permit Helix to seek specific performance. But the trial court's ruling amounts to neither a finding TURSS must perform or Helix deserves specific performance. Moreover, Helix did not seek specific performance, so contending it may prevail on the claim in the future constitutes pure conjecture.

¶ 69 Moreover, even if Helix succeeded on one of its claims, given that each party won and lost on different claims, neither party is entitled to prevailing party fees. *Id.*

¶ 70 E. Dismissal of Fraud Claim

¶ 71 Helix argues the trial court erred in dismissing its fraud claim under section 2-619 because it properly pled all elements of a promissory fraud claim. Specifically, (i) TURSS repeatedly made false representations of material fact, asserting its intention to complete the electronic software platform and market the Helix leases on its website, (ii) Helix reasonably relied on those representations, including Ivey, who left gainful employment to start, fund, and operate Helix, and (iii) Helix suffered injury in the form of lost revenue and income.

¶ 72 A party asserting a claim for promissory fraud must allege a "false statement of material fact; *** knowledge or belief of the statement's falsity; *** intent to induce the plaintiff to act or refrain from action on the falsity of the statement; *** the plaintiff reasonably relied on the false statement; and *** damage from such reliance." *Bayview Loan Servicing, LLC v. Szpara*, 2015 IL App (2d) 140331, ¶ 34.

¶ 73 The trial court concluded that allegations of the first amended complaint refuted Helix's allegation of an intent to defraud when TURSS made the promises. The trial court concluded "defendant was, in fact, taking this contract seriously at the outset," noting that the complaint alleged (i) TURSS assigned a particular employee to be in charge of the project, (ii) an amendment extended the term of the contract, (iii) there were "other delays," and (iv) in a letter dated January 19, 2012, TURSS responded to a request to re-review the delays. Thus, the trial court held that these allegations contradicted Helix's allegations of fraudulent intent, and we agree.

¶ 74 Helix contends that the allegations further, rather than disprove, its fraud claim. Helix reasons that TURSS deceived it into thinking the project was moving forward by appearing to work on the platform and pretending someone was in charge of overseeing it. But Helix presents no evidence of deception, such as TURSS not intending to build the platform or purposely causing the delays. Significantly, the marketing agreement included a nonexclusivity clause permitting either party to sell leases outside the agreement.

¶ 75 We agree with the trial court that Helix's allegations fail to allege that TURSS acted with the intent to defraud and support the opposite finding. TURSS showed that it intended to follow through, but a series of delays stymied its efforts.

¶ 77    Helix also asserts that the trial court erred in finding that other provisions of the marketing agreement supported dismissing the fraud claim. Helix points to the absence of a completion date, the inclusion of a merger clause, and a nonexclusively provision. Helix insists that these provisions made it impossible to prove reasonable reliance, proximate causation, and damages.

¶ 78    According to Helix, a reasonable time is implied, despite the absence of a completion date. See *Werling v. Grosse*, 76 Ill. App. 3d 834, 842, (1979). What constitutes a reasonable time depends on several factors, including the facts, the nature of the circumstances, and the product. See *Yale Development Co. v. Aurora Pizza Hut, Inc.*, 95 Ill. App. 3d 523, 525 (1981). Since the contract implies a reasonable amount of time to complete the platform, it could reasonably rely on TURSS's repeated promises. But, as the trial court noted, that rule applies to breach of contract, not fraud claims.

¶ 79    Further, the agreement prohibits oral modification and "may not be altered, amended, or modified except by written instrument signed by the duly authorized representatives of both parties." So the agreement prevents Helix from showing reasonable reliance on alleged oral misrepresentations after the execution of the marketing agreement.

¶ 80    Finally, the nonexclusivity provision permits Helix to sell the leases outside the agreement, preventing reasonable reliance. *McKown v. McDonnell*, 31 Ill. App. 2d 190 (1961) (broker with nonexclusive right to list property had no claim for conspiracy to defraud because vendor and purchaser owed no duty to deal exclusively with him).

¶ 81    Affirmed.

¶ 82    JUSTICE WALKER, dissenting:

¶ 83    I respectfully dissent because the standard set by the majority interprets the exceptions to the new business rule too narrowly, thereby shielding too much misconduct from liability. Our supreme court has explained that when a new business sues for lost profits,

> "absolute certainty as to the amount of loss or damage in such cases is unattainable, but that is not required to justify a recovery. All the law requires is that it be approximated by competent proof. That proof of the exact amount of loss is impossible will not justify refusing compensation. If that were the law, contracts of the kind here involved could be violated with impunity. All the law requires in cases of this character is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages." (Internal quotation marks omitted.) *Schatz v. Abbott Laboratories, Inc.*, 51 Ill. 2d 143, 147-48 (1972).

¶ 84    No case supports the majority's restriction of the exception to the new business rule to proof of actual profits for effectively identical products. The restriction, which permits parties to breach many contracts with impunity, conflicts with the reasoning of *Schatz* and with the rule in most jurisdictions. The majority's reasoning conflicts with the general rule.

> "[C]ourts in most *** jurisdictions[ ] have recognized that a new business should not be prevented from recovering lost profits caused by a breach of contract, merely because of the absence of a prior track record of profits. *** [M]any courts have recognized the unfairness in requiring a plaintiff to establish its lost profits with reasonable certainty, where it is the breaching defendant's wrongful conduct that has

prevented the plaintiff from establishing with reasonable certainty what, if any, profits it would have realized." Michael D. Weisman & Ben T. Clements, *Protecting Reasonable Expectations: Proof of Lost Profits for New Businesses*, 76 Mass. L. Rev. 186, 197 (1991).

¶ 85 The problem of proving lost profits where the plaintiff sought to market a new product that improves on products available for sale parallels the problem of proving lost profits when a defendant breaches a contract to market the plaintiff's patented invention. Because the invention differs significantly from other products in the market, the market for other products will not match the market for the plaintiff's invention. Nonetheless, courts have in some cases awarded lost profits as damages when a defendant has breached a contract to market a patented invention. *Perma Research & Development Co. v. Singer Co.*, 402 F. Supp. 881, 898 (S.D.N.Y. 1975), *aff'd*, 542 F.2d 111 (2d Cir. 1976), states the general rule:

> "Although lost profits in a new venture are not ordinarily recoverable [citation], they may be awarded where: the loss of prospective profits are the direct and proximate result of the breach; profits were contemplated by the parties when they entered the contract; and there is a rational basis on which to calculate the lost profits."

See also *Rogerson Aircraft Corp. v. Fairchild Industries, Inc.*, 632 F. Supp. 1494 (C.D. Cal. 1986).

¶ 86 The court in *Perma Research* awarded damages based largely on sales projections made by the defendant's employees in the process of deciding whether to enter the contract. *Perma Research*, 402 F. Supp. at 901. An expert's report on the market, supported by sufficient data concerning comparable products, may also support an award of damages for an unmarketed product. In *ASTech International, LLC v. Husick*, 676 F. Supp. 2d 389 (E.D. Pa. 2009), the defendant, an attorney, negligently failed to obtain a patent for the plaintiff's pharmaceutical invention. Because of the lack of a patent, the plaintiff could not market the invention. To prove damages, the plaintiff presented a report of an expert with "considerable experience *** in the pharmaceutical field [, who] provide[d] a list of potential buyers, a list of comparable transactions and projections of sale price and royalty income." *ASTech*, 676 F. Supp. 2d at 405-06. The court found the expert's report sufficient to present to a jury for assessment of damages.

¶ 87 Helix's expert, Cohen, is an attorney and real estate broker with 35 years of experience, who served on a Joint State Government Commission on Real Property Law and who worked with the NAA on its lease forms. He estimated Helix's loss by using (1) data from the United States Census on the number of residential leases in the country, (2) data from two Internet sources on the volume of traffic at Transunion's website, and (3) industry data on conversion rates, which show the percentage of site visits that turn into sales, differentiated for distinct industries. Cohen also used his knowledge of the sales of NAA's lease forms and the price NAA charged for the forms to estimate the amount Helix could earn from sales of its products, which Cohen considered superior to NAA's product. Cohen found data on the actual sales of another lease form marketed without Transunion's reputation and prominence. The other vendor sold approximately 35,000 forms per year for a product Cohen considered substantially inferior to Helix's product. Using all the historical information, Cohen estimated that Helix could soon sell 110,000 leases per year, with market penetration likely to increase steadily.

¶ 88 Helix's second expert, Smith, who specialized in economic analysis, used Cohen's research and Transunion's own projections to estimate the likely loss Helix suffered due to Transunion's

failure to provide the promised platform for Helix's lease sales. The use of Transunion's projections echoes the use of Singer's projections in *Perma Research*.

¶ 89    Both of Helix's experts based their estimates on data concerning the size of the market, number of probable page views on a Transunion platform, likely rates of conversion from page views to sales, and the actual sales of inferior products serving similar needs. The expert testimony here meets the standards of *Milex Products, Inc. v. Alra Laboratories, Inc.*, 237 Ill. App. 3d 177 (1992), *Perma Research*, 402 F. Supp. at 898, *Rogerson Aircraft Corp.*, 632 F. Supp. 1494, *ASTech*, 676 F. Supp. 2d 389, *Antrim Pharmaceuticals LLC v. Bio-Pharm, Inc.*, 310 F. Supp. 3d 934 (N.D. Ill. 2018), and cases cited in Michael D. Weisman & Ben T. Clements, *Protecting Reasonable Expectations: Proof of Lost Profits for New Businesses*, 76 Mass. L. Rev. 186 (1991). The opinions of Cohen and Smith give the trier of fact "a rational basis on which to calculate the lost profits." *Perma Research*, 402 F. Supp. at 898.

¶ 90    Based on the reasoning of *Schatz* and *Milex*, I would apply the exception to the new business rule in this case, as there is reliable market data to support plaintiff's claim of damages. I would find that there are genuine issues of material fact as to whether plaintiff is able to show lost profits damages to a reasonable degree of certainty as an exception to the Illinois new business rule. Hence, I would reverse the circuit court's grant of summary judgment and reman for trial. Accordingly, I respectfully dissent.